**UNITED STATES of America,
Plaintiff,**

v.

**Raymond Ralph ROBERTS, Defendant.
No. LR-63-CR-140.**

United States District Court
E. D. Arkansas, W. D.

Nov. 6, 1963.

Robert D. Smith, Jr., U. S. Atty., James W. Gallman and W. H. McClellan, Asst. U. S. Attys., Little Rock, Ark., for plaintiff.

John W. Bailey, M. Drew Bowers, Little Rock, Ark., for defendant.

HENLEY, Chief Judge.

On September 12, 1963, the federal grand jury for the Eastern District of Arkansas returned an indictment charging the defendant, Raymond Ralph Roberts, with the murder of Dr. Keith E. Herlocker, a Government employee, in his office in the Veterans Administration Hospital at Fort Roots, North Little Rock, Arkansas, premises admittedly within the exclusive jurisdiction of the United States.[1]

Capable counsel were assigned to represent the defendant without charge. Defendant was tried to a jury, and on October 22, 1963, was found guilty of murder in the second degree.[2] On October 24 the Court, after hearing statements of counsel on both sides and after having given the defendant an opportunity to make a statement in his own behalf, sentenced defendant to life imprisonment, the maximum punishment prescribed for second degree murder.

On October 25 there was filed on behalf of the defendant a motion for a new trial asserting that the verdict of the jury is "contrary to both the law and the evidence," that the Court erred in admitting certain testimony, that the Court erred in failing to declare a mistrial on account of a statement made in the presence of the jury by the Assistant United States Attorney trying the case in the course of the trial, and that the Court erred in overruling a pre-trial motion to suppress evidence. In this memorandum the Court will deal with those contentions in the order mentioned.[3]

---

1. 18 U.S.C.A. § 1111. The indictment charges that on or about March 4, 1963, "in the Western Division of the Eastern District of Arkansas, and on lands acquired for the use of the United States and under the exclusive jurisdiction of the United States, Raymond Ralph Roberts, with premeditation shot and murdered Keith E. Herlocker."

2. The indictment was considered to charge murder in the first degree and to include the lesser offenses of murder in the second degree, which is also defined and proscribed by 18 U.S.C.A. § 1111, and voluntary manslaughter, 18 U.S.C.A. § 1112. The jury was instructed as to all three grades of homicide.

3. In its order overruling the pre-trial motion to suppress the Court reserved the right to file a post-trial memorandum discussing that motion. Since the propriety of denying the motion to suppress will be discussed in this opinion, no separate opinion dealing with that matter will be filed.

There is little, if any, dispute about the evidentiary facts of the case which may be summarized as follows:

It is a well known fact that the Fort Roots facilities are employed in large measure in the treatment of patients suffering from mental or nervous disorders. Naturally, the hospital is interested in the vocational rehabilitation of patients and maintains a vocational counselling service. Dr. Herlocker, a psychologist, was the head of that service. His office was located in Building 89 on the hospital grounds, and his secretary had an adjoining office, the two offices being connected by a door. In order to enter Dr. Herlocker's office it was not necessary to pass through the secretary's office as there was another door connecting the doctor's office with a hall.

Defendant, a middle aged white man with a long record of military service, was admitted to the hospital early in March 1962. While between his admission and the date of the shooting of Dr. Herlocker defendant spent most of his time in the hospital, part of that time being confined in a locked ward,[4] he was given weekend passes from time to time which enabled him to visit his wife and child in El Dorado, Arkansas, in which city was the family home. The defendant knew Dr. Herlocker having consulted him in the doctor's professional capacity. Since defendant had been a patient in the hospital for about a year prior to the shooting and had consulted the doctor, it is fairly inferable that he was familiar with the doctor's office and with the means of ingress thereto.

On some date prior to February 28, 1963, defendant had filed a claim for a period of disability and for the payment of disability insurance benefits under the Social Security Act, and it appears that Dr. Herlocker had some connection with this application. While the application was pending, defendant stated to a fellow patient, one Monk, that Dr. Herlocker appeared to think that if a patient could work at tasks in and around the hospital he could make a living outside, and defendant stated also that unless his application should be granted he would kill Dr. Herlocker. Monk attached no particular significance to that statement and did not report it to anyone in authority. On February 28, 1963, Mr. Bayard Taylor of Little Rock, a hearing examiner for the Social Security Administration, filed an opinion denying or recommending the denial of defendant's application. On the same date a copy of this opinion enclosed in a penalty envelope bearing Mr. Taylor's official return address was mailed to defendant at his El Dorado address. In due course of post the opinion would have been delivered at defendant's home in El Dorado on Friday, March 1, 1963.

On March 1 or March 2 defendant received a pass from the hospital and went to El Dorado where he received or found the opinion adverse to his Social Security claim. Defendant returned to the Greater Little Rock area on Sunday, March 3. He made the round trip from North Little Rock to El Dorado in his gray pickup truck.

On the evening of March 3 defendant appeared at the address where Mr. Taylor had once lived and asked for Mr. Taylor. The current occupant of the house, a Mrs. Mack, advised defendant that Taylor had moved and gave defendant Taylor's new address. She was not able to direct defendant to that address, however, and advised him to make inquiry elsewhere. Defendant then departed. Mrs. Mack testified that defendant was friendly and courteous but appeared to be intoxicated.

On the morning of March 4 Dr. Herlocker and his secretary were in their respective offices about 9:00 o'clock. Dr. Herlocker directed his secretary to interview a patient, and then closed the door which connected his office with that of the secretary. In a few moments the secretary heard a noise from the doctor's office, which noise turned out to have been a shot. She rushed into the office and found the doctor in a recumbent position

---

4. It seems that defendant was being treated for chronic and acute alcoholism, arthritis, and gout.

in his chair shot through the head from left to right. The doctor died two days later, and the jury was justified in finding and obviously did find that he died as a result of the gun shot wound just mentioned.

When the secretary entered the doctor's office, no one else was in the room, and the doctor was incapable of speech. However there was found on his desk Hearing Examiner Taylor's envelope in which his opinion had been mailed to the defendant. The opinion was not with the envelope. There was also discovered in the doctor's office the spent bullet which had passed through his head.

A search for the defendant was instituted by local and federal officers, and about two hours later he was apprehended asleep and intoxicated in his pick-up truck which he had parked on the streets of North Little Rock. An immediate search of defendant's person revealed Hearing Examiner Taylor's opinion which has been mentioned. No gun was found on defendant's person or in his truck, and indeed, as far as the evidence shows, the gun with which Dr. Herlocker was shot has never been found.

Defendant was questioned by one or more Federal Bureau of Investigation agents at the North Little Rock police station and professed complete ignorance of the events of the morning prior to his arrest. He did recall returning from El Dorado the previous night, and stated that he had slept in his truck. He admitted receiving the Taylor opinion at El Dorado and identified the envelope which has been described. He was unable to explain how the envelope came to be on Dr. Herlocker's desk at the hospital while at the same time the opinion was in his own possession. Questioned about ownership of a pistol, defendant stated that he had once owned such a weapon, but had sold it about a year before. He denied ownership of a firearm at the time of questioning.

With affairs, in this posture, the federal agents requested the El Dorado Police Department to interview defendant's wife with reference to her husband's ownership of a pistol. Chief of Police Thomas and Police Lieutenant Taylor complied with this request. In their interview with Mrs. Roberts the officers were informed that Roberts did not own a pistol at that time, but that he had owned one previously. Mrs. Roberts stated that her husband disposed of the pistol after he had discharged it in the house; and she advised also that the bullet had lodged in the ceiling.

When this information was relayed to the federal investigating officers, they requested Chief Thomas and Lieutenant Taylor to undertake to recover the bullet which Mrs. Roberts had mentioned so that it might be compared with the bullet with which Dr. Herlocker had been shot.

On March 5 Chief Thomas and Lieutenant Taylor went to see Mrs. Roberts at the home of a friend some eight miles from the Roberts home and requested her to sign a "consent to search" which Taylor had prepared and which has been introduced in evidence. It was explained to Mrs. Roberts that she was not required to execute the document unless she desired to do so. Mrs. Roberts did execute the "consent," and she, the officers, Mrs. Roberts' female friend, and the small son of Mr. and Mrs. Roberts all returned to El Dorado where Mrs. Roberts admitted the officers to the house. The officers probed successfully for and recovered the bullet for which they were looking, and that bullet was turned over to the Federal Bureau of Investigation.

At the trial of the case this bullet and the bullet which killed Dr. Herlocker were introduced in evidence, and a ballistics expert from the Federal Bureau of Investigation laboratory in Washington, D. C., testified that in his opinion both bullets had been fired from the same pistol.

Prior to defendant's indictment the Court entered an order committing defendant to the Medical Center for Federal Prisoners at Springfield, Missouri, pursuant to 18 U.S.C.A. § 4244, for examination and for evaluation with respect to defendant's competency to stand trial. In due course the staff of the Medical

Center reported to the Court that in their opinion defendant was mentally competent to be tried. No opinion was expressed as to defendant's mental competency at the time of the commission of the alleged offense.

On September 25 defendant was arraigned on the indictment and his counsel entered a plea of not guilty. Counsel indicated at the time that they did not admit that defendant had killed the deceased, but that they might contend that if defendant did in fact kill the doctor he was legally insane at the time of the killing, and they indicated still further that they might wish to contend that defendant was in fact not competent to stand trial.

On October 4 the Court addressed a joint letter to all counsel in the case, a copy of which letter has been made a part of the record. In that letter the Court requested defense counsel to advise at once whether they would desire a preliminary hearing on the question of defendant's competency to stand trial, and that if such a desire should be expressed a preliminary hearing would be held on the morning of the trial. The Court then went on to indicate that in the absence of a request for a preliminary hearing a finding based on the report from the Medical Center would be made that defendant was competent to stand trial.

On October 8 counsel for defendant, without replying directly to the Court's letter of October 4, filed a motion requesting that a psychiatrist be appointed to examine the defendant and to testify as to his sanity, the examination and testimony to be at Government expense. The motion was based on Rule 17(b) of the Federal Rules of Criminal Procedure, 18 U.S.C.A., but was not supported by an affidavit of poverty and was for that reason insufficient.

On October 11 the Court filed a memorandum and order in connection with the motion just mentioned, and in the memorandum reviewed the entire proceedings in the case up to that point. On the basis of the materials before it the Court found that defendant was competent to stand trial and set the case for October 21. The Rule 17(b) motion was denied, but the Court announced its intention to appoint an expert witness as provided by Rule 28 to examine the defendant, to form an opinion as to his competency to stand trial and as to his competency at the time of the alleged offense, to report his findings to Court and counsel, and to be prepared to testify should he be called by counsel on either side or by the Court. Counsel were directed to furnish the Court with names of nominees by 11:00 A.M. on the following day.

No formal nominations were submitted by either side, and on October 15 the Court entered an order appointing Dr. W. Peyton Kolb, a Little Rock psychiatrist, as the Court's expert witness for the purposes above stated. Dr. Kolb interviewed defendant in the Pulaski County Jail in Little Rock and submitted to the Court and to counsel on both sides a detailed report as to his findings. It should be observed that prior to his examinations of defendant Dr. Kolb received written instructions as to his duties, which instructions are part of the record herein.

It was the opinion of Dr. Kolb that while defendant was not without psychiatric and psychological problems, he was competent to stand trial and was not either on the dates of the examinations or on the date of the shooting of Dr. Herlocker, legally insane measured by the test approved by the Court of Appeals for this Circuit in Feguer v. United States, 302 F.2d 214, and earlier cases cited in that opinion.[5]

At the trial of the case the Government's theory was that defendant had determined to kill Dr. Herlocker if defendant's social security claim was denied; that the claim was denied, and that de-

---

5. There is no question that defendant is not a "normal" individual, but it is well settled in this Circuit that a mere defect of reason or some impairment of mind not amounting to legal insanity does not relieve an individual of criminal responsibility for his acts.

fendant learned of the denial during his weekend visit to his home in El Dorado; that defendant returned to North Little Rock and on the morning of March 4 entered Dr. Herlocker's office and shot him with malice aforethought and with deliberation and premeditation. To establish this theory the Government relied on the following chain of circumstances shown in evidence:

1. The threat on the life of the deceased made by defendant to the witness, Monk.

2. The denial of the social security claim and defendant's knowledge of that denial.

3. Defendant's visit to Hearing Examiner Taylor's former home on the evening of March 3.

4. The fact that defendant was observed on the hospital ground prior to the shooting.

5. The fact that the Taylor envelope was found on the desk of the deceased, and the opinion was found on defendant's person.

6. The fact that the ballistic markings on the bullet extracted from the ceiling of the house in El Dorado matched those on the bullet which killed Dr. Herlocker.

The Government having completed its case and rested, counsel for the defendant moved for a judgment of acquittal, and when that motion was denied, the defense rested without calling the defendant or any other witness to the stand. Immediately after resting defense counsel renewed their motion for a judgment of acquittal, and that motion was denied.

Both sides having rested, the Court and counsel retired to chambers to settle the instructions. In the course of the conference in chambers the Government contended that the record was bare of any evidence which would make a submissible issue on the question of insanity. After discussion, the Court found itself in agreement with the Government and over the objection and exception of the defendant that issue was not submitted.[6]

As stated, the question of the defendant's guilt or innocence of all three degrees of homicide was submitted to the jury. The jury was told that if they found from the evidence beyond a reasonable doubt that defendant killed the deceased on government premises with malice aforethought and with premeditation and deliberation, they should find him guilty of murder in the first degree; that if they found that the defendant killed the deceased with malice but without premeditation or deliberation, they should find defendant guilty of murder in the second degree; and if they found that the defendant killed the deceased without malice but upon a sudden quarrel or heat of passion, they should find the defendant guilty of voluntary manslaughter.

"Malice" was defined to the jury as being that "state of mind which moves an individual consciously to kill or to inflict serious bodily injury on another without legal excuse or justification," and the jury was told that a person acts maliciously "when he consciously wrongs another in his person or property without just cause or excuse and in such a way or in such circumstances as to indicate that the act proceeded from a wicked or depraved heart." "Deliberation" and "premeditation" were defined to the jury in conventional terms.

In view of the evidence that defendant was intoxicated on the morning of March 4, the jury was told that voluntary intoxication is not ordinarily a defense to a criminal charge, but that where in-

6. The Government was not required in the first instance to introduce proof that the defendant was sane. The defendant chose not to call Dr. Kolb, and in the circumstances the Court did not deem it to be its function to call the doctor, particularly in view of the fact that his report was to the effect that defendant was sane. While defendant objected to the Court's refusal to instruct the jury on insanity, that refusal is not set forth as an assignment of error in the motion for a new trial.

tent, premeditation, and deliberation are involved, the intoxication of a defendant may be material. And the jury was further instructed that if it appeared that the defendant at the time he shot the deceased, if he shot him, was intoxicated to such an extent as to be incapable of forming a specific intent to kill or to be incapable of acting with deliberation and premeditation, the defendant could not be convicted of murder in the first degree, although he might be found guilty of murder in the second degree.

As to punishment, the jury was told that if the defendant was found guilty of murder in the first degree the law fixed his punishment at death unless the jury should qualify the verdict by adding the words "without capital punishment." And the jury was instructed that if the defendant should be found guilty of second degree murder or of manslaughter his punishment would be by imprisonment for a period to be fixed by the Court within statutory limits.

### I.

◼ Assuming that the assertion in the motion under consideration that "the verdict was contrary to both the law and the evidence in this case" presents a concrete assignment of error, the Court is convinced that if no error was committed in the reception of evidence, the assertion above quoted is devoid of merit. In the Court's estimation the circumstantial evidence introduced by the Government was amply sufficient to have justified the jury in finding the defendant guilty of murder in the first degree without qualification. Laying entirely to one side the threat communicated to Monk, and the visit of the defendant to the Taylor home, the jury may well have considered that the fact that the Taylor envelope was on the desk of the deceased whereas the contents of the envelope were found on defendant's person, and the further fact that the bullet discovered at El Dorado on defendant's premises matched the bullet which killed the doctor, were circumstances consistent with guilt and inconsistent with innocence and

were strong enough probatively to convince of guilt beyond a reasonable doubt. That the jury in fact found the defendant guilty of second degree murder rather than of murder in the first degree may be due to the fact that the jury believed that defendant was too intoxicated to form a specific intent to kill or to act with deliberation and premeditation, or at least entertained a reasonable doubt as to defendant's capacity in those regards.

As the Court stated in connection with the imposition of sentence, the Court is convinced that the defendant killed Dr. Herlocker with malice aforethought, and that his actions proceeded from an evil disposition and from a wicked and depraved heart.

### II.

◼ Defendant next contends that the Court erred in permitting Mrs. Mack to testify as to defendant's visit to the former home of Mr. Taylor. The admission of that evidence is said to have been erroneous because the defendant made no threats against Taylor, and, in any event, no evidence of threats would be admissible other than express threats against the deceased. The Court does not agree.

It is quite true that on the occasion in question the defendant made no threats against anyone. But, on a former occasion he had threatened to kill Herlocker if the social security claim was denied. The claim was denied by Mr. Taylor. The evidence of Mrs. Mack was to the effect that defendant came to Taylor's former home in the night time and within a very short time after receiving his copy of the opinion adverse to him. And, as has been shown, Dr. Herlocker was in fact shot the following morning.

There was a clear connection between Taylor and the deceased, as far as defendant was concerned, and the evidence of defendant's visit to the former home of Taylor on the night preceding the killing was admissible as showing a continuous chain of events leading up to the killing, and as bearing upon defendant's state of mind, motive, and intent. Of course, it was for the jury to say what

inference, if any, was to be drawn from the visit in question and what weight, if any, should be given to the evidence of the visit.

### III.

On the second day of the trial the Government called as a witness a hospital employee, O. G. Murphy, who testified that on the morning of March 4, prior to the shooting, he was working around the hospital grounds and saw the defendant driving his gray pick-up truck on the hospital premises. Murphy was positive in his identification of defendant.

The Government next called another hospital employee, Frances M. Williams, who testified that she drove her car to work on that morning and parked it in a parking lot. After she got out of her car she noticed a gray pick-up truck parked next to a green Cadillac, and she saw a man standing between the two vehicles lurching back and forth. She described this individual in some detail, and her description fitted that of the defendant. However, when she was asked the direct question whether defendant was the man she saw, she replied categorically that he was not, and she repeated that statement on redirect examination.

■ In his closing argument counsel for the Government undertook to explain why Miss Williams had been called by the prosecution, and in that connection he commenced a sentence containing words to the effect that the witness had picked out Roberts in a police lineup. Before counsel could complete his sentence, defense counsel interposed an objection which was promptly sustained. Government counsel's sentence was never completed. Defense counsel then moved for a mistrial. That motion was denied, but the jury was admonished not to consider the statement in question. The Court's failure to declare a mistrial is assigned as error.

The statement of counsel for the Government was improper, but the Court did not and does not consider that it was serious enough to call for a mistrial or for a new trial. Any prejudice which may have resulted from the statement was eliminated by the Court's sustaining defense counsel's initial objection and by the Court's admonition to the jury in connection with the denial of the motion for a mistrial.

### IV.

There remains for consideration the contention that the Court erred in denying defendant's pre-trial motion for the suppression as evidence of the bullet which the El Dorado police officers obtained from defendant's home, and in admitting that bullet in evidence over the objection of defendant. This contention presents a more serious question than the others raised by the motion.

It will be recalled that the El Dorado officers entered the defendant's home in El Dorado and recovered the bullet with the consent of defendant's wife. At the hearing on the motion to suppress defendant testified that he never consented to the entry and search of his home and was never asked to consent thereto. Defendant's testimony to that effect was not controverted. There is no reason to discredit it, and the Court accepts it as true for present purposes.

■ The Fourth Amendment to the Constitution of the United States provides that the right of the people to be secure in their persons, houses, papers, and effects against "unreasonable searches and seizures" shall not be violated, and that no search warrants shall issue except upon probable cause, supported by oath or affidavit, and particularly describing the place to be searched, and the persons or things to be seized. And ever since the decision of the Supreme Court in Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652, it has been thoroughly settled in the federal courts that materials obtained by the Government by · means of an "unreasonable search and seizure" cannot be used in evidence in a criminal case against a defendant whose Fourth Amendment rights have been violated.

The issuance of federal search warrants is governed by Rule 41 of the Federal Rules of Criminal Procedure, and under that Rule a search warrant authorizing a search and seizure may be issued only in relation to specified types of property, namely: (1) Property stolen or embezzled in violation of the laws of the United States; (2) Designed or intended for use or which has been used as the means of committing a criminal offense; (3) Possessed, controlled, or designed or intended for use or which is or has been used in aid of a foreign government. (18 U.S.C.A. § 957.)

Obviously, the spent bullet lodged in the ceiling of the house in El Dorado does not fall within any of the categories prescribed by Rule 41. No valid search warrant could have been obtained by the execution of which the bullet could have been located and recovered; and, as indicated, no effort was made to obtain any such warrant.

It is the position of the defendant that the search for and seizure of the bullet without the consent of the defendant were unreasonable and unlawful, notwithstanding the consent of his wife. The Government contends on the other hand that the search and seizure were reasonable and lawful. While the question may be deemed a close one, the Court adheres to its original conclusion that the bullet was located and recovered in a lawful manner and that its reception in evidence was proper.

■ In discussing the question the Court will say at the outset that it has no difficulty in finding and does find that if the search and seizure were unlawful, the defendant is a "person aggrieved" thereby, and thus had standing under Rule 41(e) to move to suppress the bullet as evidence and to object at the trial to its admission. Foster v. United States, 8 Cir., 281 F.2d 310, and cases there cited.

■ While the protection of the Fourth Amendment extends to both innocent and guilty, the Amendment does not prohibit all searches and seizures, but only those that are "unreasonable." See United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653; Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399; Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543, 39 A.L.R. 790; Lawson v. United States, 8 Cir., 254 F.2d 706. And ordinarily a search and seizure are not deemed to be unreasonable and therefore unlawful if based upon a valid consent freely and understandingly given. Sartain v. United States, 9 Cir., 303 F.2d 859; United States v. Eldridge, 4 Cir., 302 F.2d 463; Teasley v. United States, 9 Cir., 292 F.2d 460; Waldron v. United States, 95 U.S.App.D.C. 66, 219 F.2d 37; Honig v. United States, 8 Cir., 208 F.2d 916; Judd v. United States, 89 U.S.App. D.C. 64, 190 F.2d 649; Shores v. United States, 8 Cir., 174 F.2d 838; Stein v. United States, 9 Cir., 166 F.2d 851. But where the Government relies upon consent to validate an otherwise unlawful search, the burden is upon the Government to establish the sufficiency of the consent relied upon. Judd v. United States, supra.

■ The authorities are uniformly to the effect that where a defendant or suspect himself freely and understandingly consents to a search of his own premises, such a search and a consequent seizure of property or evidentiary material are not unreasonable. See e. g.: Davis v. United States, 328 U.S. 582, 66 S.Ct. 1256, 90 L.Ed. 1453; Channel v. United States, 9 Cir., 285 F.2d 217; United States v. Dornblut, 2 Cir., 261 F.2d 949; United States v. Arrington, 7 Cir., 215 F.2d 630; Higgins v. United States, 93 U.S.App.D.C. 340, 209 F.2d 819; Honig v. United States, supra; United States v. Jones, 7 Cir., 204 F.2d 745; Judd v. United States, supra. Where the consent relied upon is given by a person other than the defendant or suspect, there is no hard and fast rule that the search and seizure are lawful on the one hand or unlawful on the other hand. Some such searches and seizures have been upheld; others have been stricken down.

Illustrative cases holding legal searches and seizures based upon the consent of one other than the defendant or suspect are: Abel v. United States, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668; United States v. Eldridge, supra; United States v. Sferas, 7 Cir., 210 F.2d 69; Stein v. United States, supra; United States v. Goodman, N.D.Ill., 190 F.Supp. 847. Illustrative cases holding searches and seizures so authorized to be unlawful are: Amos v. United States, 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654; Waldron v. United States, supra; Holzhey v. United States, 5 Cir., 223 F.2d 823; United States v. Blok, 88 U.S.App.D.C. 326, 188 F.2d 1019; Cofer v. United States, 5 Cir., 37 F.2d 677. A decision that a search and seizure authorized by a person other than the defendant were unreasonable may be based upon the ground that the consent or authorization was not actually voluntarily and understandingly given, as in Amos and Waldron, both supra, or upon the ground that the person giving the consent or authorization had no right to do so, as in Holzhey and Blok, supra.

 If a general rule must be extracted from the cases cited above and many others which might have been cited, it may be said with some degree of assurance that assuming a truly voluntary and understanding consent or authorization the same is sufficient to validate a search if given by a person who is in the sole possession or has sole control of the premises in question or who has an equal right with the defendant or suspect to the possession or control of the premises, provided that the search is limited to the general premises and does not involve entry into portions of the premises obviously reserved to the exclusive use of the defendant or suspect or the opening or breaking into drawers, bureaus, boxes, trunks, or like containers used for the storage of his property or effects.

 However, problems of the sort now under consideration should not be solved solely by reference to general rules or to concepts of authority, agency, privity, or the like. In the last analysis the question of the validity of a given search and seizure must be determined by reference to whether that particular search and seizure were reasonable or unreasonable, and that determination must be made on a case to case basis in the light of all of the surrounding facts and circumstances. United States v. Rabinowitz, supra; Harris v. United States, supra; Lawson v. United States, supra; Kernick v. United States, 8 Cir., 242 F.2d 818; Schwimmer v. United States, 8 Cir., 232 F.2d 855. In cases of this kind courts are not concerned ultimately with whether the person giving the consent, whether the wife, employer, landlord, or a person standing in some other relation to the person at whom the search is being directed, was the agent of such person or had authority from him, but rather with the question of whether the officers making the search and effecting the seizure acted fairly and reasonably on the one hand, or unfairly, oppressively, or unreasonably on the other hand. In this connection in Schwimmer v. United States, supra, it was said (p. 861 of 232 F.2d):

"The constitutional safeguard against unreasonable searches and seizures is more than a reach at mechanics in process. It is concerned with intrinsic as well as extrinsic aspects, and its look is at reality, not theory, in respect to the whole of what is being done. In general terms, the test to be applied under it is whether the thing done or attempted to be done, in the sum of its form, scope, nature, incidents and effect, impresses as being fundamentally unfair or unreasonable in the specific situation, when the immediate end sought is considered against the private right affected. But since, as emphasized, the question of reasonableness or unreasonableness in search is one of realistic and not theoretical approach, the test stated is of course merely a principle and not a rule, and so is of subjective value only, and not of

objective force, in the making of specific appraisal."

When the principles stated above are applied to the facts at hand, the search and seizure of the bullet here involved are sustainable on the theory that on March 5, 1963, the Roberts premises in El Dorado were in the possession and control of Mrs. Roberts, that she had a right of ingress and egress to and from the premises, and that by virtue of her relationship to the premises she had "authority" to authorize the search. Cf. Abel v. United States, United States v. Sferas, and Stein v. United States, all supra.

The Court prefers to base its decision, however, on the fact that from a realistic and practical standpoint there was nothing unfair, unreasonable, or oppressive in the conduct of the federal and local officers involved.

Prior to the date of the search defendant had left his El Dorado home voluntarily to return to the hospital. The premises remained in charge of his wife. On the date of the search he was in custody in Little Rock some 120 miles from El Dorado. His consent even if obtained would not have in itself given the local officers access to the house. They would have had to have obtained the consent of Mrs. Roberts to enter the house or would have had to have broken into it. On the preceding day Mrs. Roberts had voluntarily revealed to the officers that Roberts had fired the pistol in the house, and that the bullet was lodged in the ceiling. The bullet was not a contraband bullet. It had no intrinsic value and had only potential value as Government evidence. If a comparison of the bullet in the ceiling with the one which killed Dr. Herlocker indicated that the two were fired from the same gun, then the former bullet would be of obvious evidentiary value to the Government. On the other hand, if the comparison indicated that the two bullets were fired from different guns, the bullet here in question would have been of no value to the Government and might have been of value to Roberts in his defense.

No one could tell how the comparison would turn out until it was made, and it could not be made until the El Dorado bullet was found and extracted from where it was lodged. More than this, had the Federal Bureau of Investigation been able to produce the gun which shot Dr. Herlocker, the El Dorado bullet would have been without significance to either side. In view of all of the circumstances the Court thinks that the federal agents in Little Rock and the El Dorado police were justified in assuming that if Mrs. Roberts were willing for the officers to enter the house and get the bullet, no more was required.

As to the conduct of the local officers on March 5, the Court was and is convinced from the testimony heard in connection with the motion to suppress that the officers exercised no duress whatever toward Mrs. Roberts in obtaining her signature to the "consent to search." On the contrary, the Court is persuaded that her consent was freely and understandingly given with full knowledge that she was not required to consent.

The search itself was not a general search of the entire house, nor was it a rigorous search. The officers pulled up no rugs, moved no furniture, and broke open no doors, drawers, or boxes. They simply went into the house and made a probe out of a coat hanger supplied by Mrs. Roberts, and with the assistance of Mrs. Roberts probed for and located the bullet and removed it from its resting place.

In overruling the motion to suppress and in overruling the instant motion the Court is not holding as a general and abstract principle that in all cases in which a wife has control of the family premises she can validly consent to the search of those premises where the object of the search is to secure evidence against her husband. Cf. Foster v. United States, supra. There may be many sets of facts and circumstances in which a search based on such a consent would be unfair and unreasonable, but in the Court's view no such facts or circumstances are present here.

Before concluding this memorandum it should be said that in addition to the motion for a new trial which has been discussed defendant has filed a motion for a reduction of his sentence. The Court gave careful consideration to the case before imposing sentence and was and is convinced that it was in the best interests not only of the public but of Roberts himself that he receive a life sentence rather than a term of years in the penitentiary.

An order will be entered denying both motions. Leave to appeal in forma pauperis will be granted upon a proper showing of poverty being made.