**Raymond Ralph ROBERTS, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 17496.**

United States Court of Appeals
Eighth Circuit.

June 17, 1964.

Isaac A. Scott, Jr., of Chowning, Mitchell, Hamilton & Burrow, Little Rock, Ark., for appellant.

Robert D. Smith, Jr., U. S. Atty., Little Rock, Ark., for appellee, James W. Gallman, Asst. U. S. Atty., Little Rock, Ark., on the brief.

Before VOGEL, MATTHES and BLACKMUN, Circuit Judges.

VOGEL, Circuit Judge.

Appellant was convicted by a jury of murder in the second degree. He has been sentenced to life imprisonment. The victim, Dr. Keith E. Herlocker, was an employee of the Veterans Administration Hospital at Fort Roots, North Little Rock, Arkansas. The shooting, of which appellant was found guilty, occurred on the hospital premises which are admittedly within the exclusive territorial jurisdiction of the United States.[1] On motion for a new trial, the District Court, in a well-considered and carefully detailed opinion published as United States v. Roberts, D.C.E.D.Ark.1963, 223 F. Supp. 49, determined the issues, held adversely to appellant's contentions and denied the motion. Specific reference is here made to that opinion and only such recitation of the evidence as becomes

1. 18 U.S.C.A. § 1111.

necessary to determine this case will be made here. Sufficiency of the evidence has not been made. an issue. In this appeal court-appointed counsel have raised two points claiming: (1) Certain evidence was improperly admitted at the trial in that it was obtained as the result of an illegal search and seizure; and (2) the "incomplete dying declaration of the deceased" was improperly admitted into evidence. Those two points, and the factual background giving rise to them, will be discussed separately.

The deceased was shot shortly after 9:00 a. m. on March 4, 1963, and died two days later. Appellant was taken into custody late in the morning of March 4, 1963, and that afternoon was charged with assault with intent to kill Dr. Herlocker. Following the latter's death, appellant was charged with murder in the first degree and was so indicted by a grand jury on September 12, 1963.

On the morning of March 4, 1963, Lieutenant Taylor, then a Detective Sergeant, and Police Chief Thomas of the El Dorado, Arkansas, Police Department, interrogated appellant's wife, Mrs. Roberts, in her home at 1521 Champagonolle, El Dorado, Arkansas. From Mrs. Roberts the officers obtained a description of the appellant; discovered the way he was dressed the last time she had seen him; received a description of his truck; and inquired about the firearms he owned. During the course of the conversation Mrs. Roberts volunteered the information that appellant had owned a pistol and that approximately a year before he had fired it into the ceiling of their home. That information was relayed to Federal Bureau of Investigation Agents in Little Rock, who advised the preparation, for Mrs. Roberts' signature, of a statement consenting to a search of the premises at 1521 Champagonolle in order to recover the bullet. Such a statement was prepared by Lt. Taylor and the following day, March 5, 1963, Mrs. Roberts signed the consent document at the home of her relatives eight miles out of El Dorado. The consent was executed in the presence of Lt. Taylor

and Police Chief Thomas, who were dressed in plain clothes and were driving an unmarked police car. Lt. Taylor had "talked with [Mrs. Roberts] previously on the phone to see if [retrieving the bullet] would be all right." Mrs. Roberts, with her small child and a female relative, then accompanied the officers back to her home in El Dorado to conduct the search for the bullet lodged in the ceiling. Mrs. Roberts unlocked the house to admit the officers. The record does not reveal that she indicated any reluctance to the conduct of the search. In fact, the opposite would appear to be true. She assisted the officers by providing them with a coat hanger and a pair of wire pliers with which to probe for the bullet. The officers did not make a general search of the house, but "went there for the specific purpose of getting the bullet". Upon its recovery the bullet was sent to the Little Rock office of the FBI and eventually transported to the FBI Laboratory in Washington, D. C., where it was subsequently identified as having been fired from the same weapon as was the bullet which killed Dr. Herlocker.

On October 16, 1963, the appellant moved under Rule 41(e) of the Federal Rules of Criminal Procedure, 18 U.S.C. A., for return of the bullet obtained from his home and to suppress the evidence. A hearing was held on October 18, 1963, following which the motion was denied. In its order overruling the motion to suppress, the District Court reserved the right to file a post-trial memorandum and later combined discussion of this question with its memorandum opinion denying motions for new trial and for reduction of sentence. 223 F.Supp. 49, supra.

At the trial the bullet was received into evidence over objection and Warren G. Johnson, a Special Agent for the Federal Bureau of Investigation, was allowed to testify that the bullet recovered from the home of appellant and the one which killed Dr. Herlocker were "fired by the same weapon".

Appellant contends that the decision of the District Court receiving the bullet into evidence is incorrect for three reasons:

"(a) the constitutional rights of a husband granted by the Fourth Amendment cannot be waived by the consent of his wife;

"(b) the consent of Mrs. Roberts to search the home was obtained by implied coercion; and

"(c) the property seized was a personal effect of the husband and under no circumstances could the wife consent that it be seized."

Whether the Fourth Amendment protection against unreasonable searches and seizures [2] can in effect be waived by the consent of one's spouse to enter and search premises jointly occupied and controlled by husband and wife was appropriately regarded by the lower court as a "serious question" and a "close one".[3] (223 F.Supp. 49, 57, 58) Without the benefit of a Supreme Court clarification of the issue,[4] those federal courts which have considered the question have taken divergent positions. Compare, e. g., Stein v. United States, 9 Cir., 1948, 166 F.2d 851, 854–5, certiorari denied, 334 U.S. 844, 68 S.Ct. 1512, 92 L.Ed. 1768, and United States v. Sergio, D.C.N.Y., 1937, 21 F.Supp. 553, with Cofer v. United States, 5 Cir., 1930, 37 F.2d 677, 679, and United States v. Rykowski, D.C. Ohio, 1920, 267 F. 866, 871.

In United States v. Rykowski, supra, after holding that the government had failed to prove that the husband authorized the wife to consent or that the wife was acting as the husband's agent, the court stated at page 871 of 267 F.:

" * * * [The wife] had no implied authority, in the absence of her husband, to license a search of his premises."

Reaching the same result, the Fifth Circuit said in Cofer v. United States, supra, at page 679 of 37 F.2d:

" * * * The wife was without authority to bind her absent husband by waiving a legal warrant, or consenting to an unauthorized search."

2. U.S.Const. Amend. IV, provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, * * *."

3. There is no doubt that the admission of the bullet at the trial was a crucial matter. The expert testimony that the bullet was "fired by the same weapon" which killed Dr. Herlocker was highly damaging to appellant, especially in view of the fact that that weapon apparently was never recovered. Furthermore, as the District Court noted at 223 F.Supp. 49, 58, the bullet could not have been legally recovered without the consent of appellant or his wife since it was not the proper subject of a valid search warrant. It did not fall within the confines of Rule 41(b) of the Federal Rules of Criminal Procedure, 18 U.S.C.A., which authorizes the issuance of a warrant to search for and seize any property

"(1) Stolen or embezzled in violation of the laws of the United States; or

"(2) Designed or intended for use or which is or has been used as the means of committing a criminal offense; or

"(3) Possessed, controlled, or designed or intended for use or which is or has been used in violation of Title 18, U.S.C., § 957 [which relates to property used in aid of any foreign government]."

Thus, this discussion is prefaced with the assumption, arguendo, that the admission of the bullet, if in error, was prejudicial.

4. In Amos v. United States, 1921, 255 U.S. 313, 317, 41 S.Ct. 266, 65 L.Ed. 654, the Supreme Court expressly left open the question. Finding the wife's consent to the search to be ineffective because it was obtained through implied coercion, the court said at page 317 of 255 U.S., p. 268 of 41 S.Ct.:

"The contention that the constitutional rights of defendant were waived when his wife admitted to his home the government officers, who came without warrant, demanding admission to make search of it under government authority, cannot be entertained. We need not consider whether it is possible for a wife, in the absence of her husband, thus to waive his constitutional rights, for it is perfectly clear that under the implied coercion here presented, no such waiver was intended or effected."

Cf., Waldron v. United States, 1955, 95 U.S.App.D.C. 66, 219 F.2d 37, and United States v. Derman. 1946, D.C.S.D.N.Y., 66 F.Supp. 511.

Of those cases arriving at a contrary conclusion, Stein v. United States, supra, gives probably the greatest latitude to the proposition that a wife has authority to give voluntary consent to officers to enter and search premises occupied jointly with her husband and over which they exercise joint control. There the defendant and a woman had been living together as husband and wife. Following a disagreement concerning the defendant's use of opium, defendant removed the woman's clothing from the house, locked the door and retained possession of the key, and both parties commenced residing elsewhere. Shortly thereafter the woman began cooperating with federal narcotics officials. She led the agents to the house and, since she had no key, gained entrance by breaking a window. She then admitted the agents, who recovered narcotics which eventually aided in the conviction of the defendant. In affirming the judgment of conviction, the Ninth Circuit held that since the woman had a lawful right to enter the home, she could also extend an invitation to the agents to enter and thus make valid their search for and seizure of the evidence. See, also, Abel v. United States, 1960, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668; United States v. Sferas, 7 Cir., 1954, 210 F.2d 69, 74, 75; United States v. Best, D.C.Mass., 1948, 76 F.Supp. 857, 861; and United States v. Sergio, D.C.E.D. N.Y., 1937, 21 F.Supp. 553; 31 A.L.R.2d 1078, 1091.

 The District Court in the instant case, after carefully considering this question and the areas of search and seizure closely related thereto, concluded that, page 59 of 223 F.Supp.:

"* * * In the last analysis the question of the validity of a given search and seizure must be determined by reference to whether that particular search and seizure were reasonable or unreasonable, and that

determination must be made on a case to case basis in the light of all of the surrounding facts and circumstances. United States v. Rabinowitz, supra [1950, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653]; Harris v. United States, supra [1947, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399]; Lawson v. United States, supra [8 Cir., 1958, 254 F.2d 706]; Kernick v. United States, 8 Cir., 242 F.2d 818; Schwimmer v. United States, 8 Cir., 232 F.2d 855."

The District Court was of the opinion that:

"* * * the search and seizure of the bullet here involved are sustainable on the theory that on March 5, 1963, the Roberts premises in El Dorado were in the possession and control of Mrs. Roberts, that she had a right of ingress and egress to and from the premises, and that by virtue of her relationship to the premises she had 'authority' to authorize the search." 223 F.Supp. at 60.

It based its ruling to the effect that the search and seizure were not violative of the Fourth Amendment

"* * * on the fact that from a realistic and practical standpoint there was nothing unfair, unreasonable, or oppressive in the conduct of the federal and local officers involved."

Mindful of the premise that the Fourth Amendment prohibits only those searches and seizures which are "unreasonable", we believe the District Court was entirely correct in denying the motion to suppress and in admitting the bullet into evidence. We hold with the Ninth Circuit in Stein that the right of the wife here to enter the home which was in her possession and control cannot be seriously questioned and that her invitation to and authorization to the officers to enter and search was an outgrowth thereof. It is not a question of agency, for a wife should not be held to have authority to waive her husband's constitutional rights. This is a question

of the wife's own rights to authorize entry into premises where she lives and of which she had control. Additionally, the District Court's conclusion that there was nothing "unfair, unreasonable, or oppressive" about the search and seizure is soundly based. There is nothing in the record to indicate that Mrs. Roberts did not give her consent voluntarily. To the contrary, she was fully advised that the consent document was not a search warrant and that she did not have to sign it. The officers did not in any way intimate that they would or could obtain a search warrant if she did not sign the consent document. There were no threats involved here, such as in Waldron v. United States, supra, 219 F.2d at page 39, where the police warned that " * * * if they had to get a search warrant, * * * it wouldn't be their responsibility of what happened to what was in the apartment * * *." Nor did Mrs. Roberts indicate any reluctance as to the conduct of the search; rather, as noted above, she freely and intelligently aided in the recovery of the bullet.

What the Supreme Court said in United States v. Rabinowitz, 1950, 339 U.S. 56, 63, 70 S.Ct. 430, 434, 94 L.Ed. 653, is applicable herein:

> "What is a reasonable search is not to be determined by any fixed formula. The Constitution does not define what are 'unreasonable' searches and, regrettably, in our discipline we have no ready litmus-paper test. The recurring questions of *the reasonableness of searches must find resolution in the facts and circumstances of each case.* Go-Bart Importing Co. v. United States, 282 U.S. 344, 357 [51 S.Ct. 153, 158, 75 L.Ed. 374]. *Reasonableness is in the first instance for the District Court to determine.*" (Emphasis supplied.)

We believe here that the District Court's conclusion to the effect that the search of the Roberts premises and the seizure of the bullet in question were reasonable should be sustained because (1) the search and seizure were an incident of Mrs. Roberts' voluntary consent; (2) the place of the search was the home of Mrs. Roberts, who gave consent; (3) the premises were under the immediate and complete control of Mrs. Roberts; (4) the search did not extend to the personal effects of the appellant; (5) there was nothing "unfair, unreasonable, or oppressive" about the search and seizure.

■ What we have said concerning the reasonableness of the procurement of Mrs. Roberts' consent and the subsequent search of the Roberts house applies also to appellant's further assertion that even if a wife may waive the Fourth Amendment's protection against unreasonable searches and seizures of jointly owned and possessed premises, the consent of Mrs. Roberts in this case is invalid in that it was obtained through implied coercion. While it is certainly true that actual or implied coercion may vitiate a waiver of Fourth Amendment rights, Amos v. United States, 1920, 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654; Waldron v. United States, supra, there is nothing in the record to support a charge that coercion, either actual or implied, existed here. We are not persuaded that appellant's description of the "imposing" presence of two "overpowering representatives of the law enforcement" including the "Chief of Police himself" amounts to such implied coercion as would invalidate the consent document executed by Mrs. Roberts. To the contrary, as noted above, the record indicates that Lt. Taylor and Police Chief Thomas were dressed in plain clothes, were driving an unmarked car, and were commendably reasonable in their negotiations with Mrs. Roberts.

■ Appellant's final attack upon the denial of the Motion to Suppress and the admission of the bullet is an alternative argument to the effect that "if no implied coercion induced the consent of his wife and if this consent is generally binding upon him, it is without validity

**898**

in this particular instance, because the property seized was a personal effect of the husband". He cites in support thereof Holzhey v. United States, 5 Cir., 1955, 223 F.2d 823, and State v. Evans, 1962, 45 Hawaii 622, 372 P.2d 365. It should be noted at the outset that Holzhey involved property taken from a *locked cabinet* in defendant's garage apartment to which the officers had been admitted upon the consent of the occupants of an upstairs apartment. And Evans was a state case in which the evidence was taken from a jewelry case (found by the court to be a "personal effect" of the defendant) in defendant's bedroom bureau drawer. Whatever may be the merits of this point propounded by appellant, it is not applicable here since the bullet cannot be said to be a "personal effect" of appellant. Black's Law Dictionary (4 ed. 1951) defines personal effects as: "Articles *associated with person*, as property having more or less *intimate relation to person* of possessor * * *." (Emphasis supplied.) By no stretch of the imagination can it be held that a bullet fired into a ceiling approximately a year before is "associated with person" or has an "intimate relation to" the person of the firer of the weapon. Additionally, it may be said that appellant abandoned the bullet and thus has no standing to claim it as a "personal effect". Cf. United States v. Minker, 3 Cir., 1962, 312 F.2d 632, certiorari denied, 372 U.S. 953, 83 S.Ct. 952, 9 L. Ed.2d 978.

 The second point raised by appellant concerns the admissibility of the "dying declaration" of the deceased. Nell Uhrich, secretary to the deceased and occupant of the office next to his, testified that on the morning of the fatal day she heard a strange noise. Upon investigating, she discovered that Dr. Herlocker had been shot. Over the objection of appellant, she stated that she could understand the first syllable of Dr. Herlocker's dying utterance. She was then permitted to testify that:

"* * * I said Dr. Herlocker, who did this to you; he said Ray—

I thought he was trying to say Reynolds, I couldn't understand him, he said Ray, Ray, twice, and that was the last thing he said."

Appellant contends that the utterance was incomplete and cites general treatise law to the effect that, in order to be admissible as a dying declaration, the statement of the deceased must be complete in itself. While it is argued by the government that the deceased's statement here was complete, we find it unnecessary to determine the question since we believe the utterance was admitted, not as a completed dying declaration, but, rather, as a spontaneous declaration or exclamation which was part of the *res gestae* and as such was clearly admissible. Spontaneous exclamations or declarations made at the time of the event or so close thereto as to be a part of the act or transaction itself are admissible as part of the *res gestae* on the theory that, under the stress and strain of the moment and without opportunity or time for reflection, a person so situated is most apt to tell the truth and also that the declaration or exclamation or utterance is a part of the thing itself and therefore admissible. The factor of proximity of the utterance to the event is determinative of admissibility and the determination thereof rests within the sound discretion of the trial court. See, generally, Lampe v. United States, 1956, 97 U.S.App.D.C. 160, 229 F.2d 43; Guthrie v. United States, 1953, 92 U.S.App.D.C. 361, 207 F.2d 19; VI Wigmore, Evidence § 1757 (3 ed. 1940). Here the condemning statement was uttered almost immediately after the deceased had been shot in the head and just prior to his lapsing into unconsciousness, from which he never recovered. Furthermore, we think it may be fairly surmised from colloquy between the court and counsel that the court and the government contemplated the admission of the utterance as a spontaneous declaration. Upon appellant's objection to testimony concerning the statement, the court inquired of government counsel as to his opinion of the

admissibility. Government counsel replied that he believed it was admissible inasmuch as "this is right after the event". Following that response, the court permitted the witness Uhrich to testify as to the statement. We hold that the trial court did not abuse its discretion and that the utterance was properly admitted.

We affirm the judgment of conviction and in so doing express our appreciation to Mr. Isaac A. Scott, Jr., of Little Rock, Arkansas, court-appointed counsel who very capably briefed and argued this appeal.