PEOPLE v. BUNKER

1. SEARCHES AND SEIZURES—PARENT AND CHILD—HOME.
  A child living with his parents has standing to attack the validity of a search of the parental home areas to which that child has equal access.

2. SEARCHES AND SEIZURES—FAMILY PREMISES—LEGALITY OF SEARCH.
  Generally, a member of a family who lives on family premises has standing to attack the legality of a search of such premises.

3. SEARCHES AND SEIZURES—PARENT AND CHILD—HOME—CONSENT.
  Parents have the right to consent to a search of their home for items which may incriminate one of their children who is living there with them, if the area to be searched is open to the common access of all members of their family.

REFERENCES FOR POINTS IN HEADNOTES
[1, 2] 29 Am Jur 2d, Evidence § 420.
  Nature of interest in, or connection with, premises searched as affecting standing to attack legality of search.  78 ALR2d 246.
[3–5, 7] 47 Am Jur, Search and Seizure § 71.
[6] 5 Am Jur 2d, Appeal and Error § 704.
[8] 53 Am Jur Trial § 198.
[9, 10] 29 Am Jur 2d, Evidence § 771.
[11] 29 Am Jur 2d, Evidence § 827.
[12] 29 Am Jur 2d, Evidence § 285.
[13] 5 Am Jur 2d, Appeal and Error § 553.
[14] 40 Am Jur 2d, Homicide § 46.

4. SEARCHES AND SEIZURES—CONSENT—BURDEN OF PROOF.

The burden of proof is on the prosecutor to establish by clear and convincing evidence that consent to a warrantless search was specifically, unequivocally, freely, voluntarily, knowingly, and intelligently given.

5. SEARCHES AND SEIZURES—CONSENT—WAIVER.

Waiver is the intentional relinquishment or abandonment of a known right; consequently, the prosecution, in seeking to rely upon consent to justify a warrantless search, must prove that consent to the search was freely and voluntarily given.

6. APPEAL AND ERROR.

The standard of review on appeal is whether a trial court was clearly in error in its conclusions (GCR 1963, 517.1, 785.1).

7. SEARCHES AND SEIZURES—PARENT AND CHILD—HOME—CONSENT.

Warrantless search of defendant's home basement and seizure of cartridge casings, a bullet, and a high chair and a storage box, both bullet-riddled, were lawful where defendant's parents consented to the search and gave the searching officers written permission to take the items (MCLA § 750.316).

8. SEARCHES AND SEIZURES—REASONABLENESS.

Failure to obtain a search warrant where one is easily obtainable weighs against an attempt by a prosecutor to characterize a warrantless search as reasonable.

9. EVIDENCE—WEAPONS—WITNESSES—IDENTIFICATION.

Inability of witnesses to make a positive identification of a pistol found near the scene of a murder as the same pistol they had seen in defendant's possession before the murder affected the weight and not the admissibility of the evidence.

10. EVIDENCE—RELEVANCE—MATERIALITY—DISCRETION.

Questions of relevance, materiality and remoteness are generally left to the sound discretion of a trial court.

11. EVIDENCE—WITNESSES—BALLISTICS EXPERT—WEAPONS.

Testimony of a ballistics expert that a spent bullet found in the basement of the house in which defendant lived and the bullet which killed a victim were fired by the same gun was relevant and material since that testimony tended to link defendant to the murder weapon.

12. Evidence—Attempted Jail Break—Guilt—State of Mind.

Evidence of an attempted jail break, while not admissible as substantive proof of guilt, can be introduced to show a defendant's state of mind.

13. Appeal and Error—Instructions to Jury—Objection—Court Rules—Waiver.

A defendant who fails to object to jury instructions when the trial court gives him the opportunity waives his right to object to the instructions on appeal (GCR 1963, 516.12).

14. Homicide—Felony-Murder—Robbery—Inferences.

A jury could reasonably infer that defendant attempted armed robbery which ended in the death of his victim where: (1) the defendant drove a car, stolen that afternoon, into a gasoline station although its tank was three-quarters full, (2) the victim, who was required to carry a moderate sum of cash on his person as part of his employment at the station, serviced the car, (3) the station manager saw money falling from the victim's hand after hearing a gunshot, and (4) defendant then fled and made every effort to escape, including avoidance of a road block and a 110-mile-an-hour chase over a considerable distance.

Appeal from Macomb, Howard R. Carroll, J. Submitted Division 2 February 4, 1970, at Lansing. (Docket No. 3,947.) Decided March 23, 1970.

David Arthur Bunker was convicted of first-degree murder. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *George N. Parris,* Prosecuting Attorney, *Thaddeus F. Hamera,* Chief Appellate Lawyer, and *Don L. Milbourn,* Assistant Prosecuting Attorney, for the people.

*Robert L. Coburn,* for defendant.

Before: Lesinski, C. J., and McGregor and V. J. Brennan, JJ.

Lesinski, C. J.   Defendant David Bunker and another man were convicted of first-degree murder, MCLA § 750.316 (Stat Ann 1954 Rev § 28.548), following a trial by jury.   The codefendants were sentenced to life imprisonment.   Defendant Bunker appeals as of right.

During the late afternoon on December 23, 1966, a red 1962 Chevrolet convertible with a white top pulled into the Clark Service Station on Van Dyke Avenue in the City of Utica.   One of the station attendants, Alan Pringle, serviced the car.   He put $2 worth of gasoline into the car, then went to the driver's side for payment.

At this time the station manager came out of the station to see if he could give assistance.   He observed the pump turned off at $2 worth of fuel and started back toward the building while Pringle went to collect from the driver.   When the manager was approximately eight to ten feet from the car he heard a loud report.   He turned and saw Pringle slumping to the pavement with money falling around him.   The red convertible immediately left the station at a high rate of speed.

Shortly after the incident officers of the Sterling Township Police Department observed an automobile matching the description of the car seen at the service station and gave chase.   The chase, at speeds up to 110 miles per hour, led through the City of Warren and several subdivisions.   The car managed to avoid a police road block at one point, but finally went out of control after hitting another vehicle and came to a stop on the median strip of Mound Road.

Defendant, the driver of the red Chevrolet, and Robert Casper, the passenger, were immediately placed under arrest.   Both were subsequently charged with first-degree murder, following the death of Alan Pringle.

At trial it was established by the prosecution through the testimony of a qualified ballistics expert that the gun which fired the fatal shot was the same gun which the police found along the chase route shortly after the chase. It was also established that the same gun had shot several spent bullets found in the basement of defendant's home.

The bullets from defendant's basement were found there during a police search conducted several days after the crime without a search warrant but allegedly with the consent of his parents. Prior to trial defendant made the proper motions to suppress the evidence found in his basement. Following the lower court's denial, they were renewed at trial, at which time an extensive record was established out of the presence of the jury on the question of whether defendant's parents consented to the warrantless search. The trial court held that consent had been given and that the search was, therefore, legal. Defendant's motion was again denied.

Defendant's first issue raised on appeal concerns the admissibility of the items located in his basement.

Initially we note that defendant has standing to attack the validity of the search of the basement of his home. Defendant, 18 years old at the time of the trial, lived at home with his parents. He contributed $20 per week toward his room and board and had his own bedroom. He had equal access, along with the rest of the family, to the basement. Defendant falls within the general rule stated in 78 ALR2d 246, § 12(a), p 267: "As a general proposition a member of a family who lives on family premises has been held to have standing to attack the legality of a search of such premises." See, also, *Jones* v. *United States* (1960), 362 US 257 (80 S Ct

725; 4 L Ed 2d 697); *Bumper* v. *North Carolina* (1968), 391 US 543 (88 S Ct 1788; 20 L Ed 2d 797).

Defendant's attack on the warrantless search is twofold. First, it is contended that defendant's parents could not legally consent to the search of their basement and the seizure of the items taken. Second, defendant argues that even if his parents could consent, they did not in fact do so. Defendant concludes that the evidence produced by the search is inadmissible under the exclusionary rules of *Mapp* v. *Ohio* (1961), 367 US 643 (81 S Ct 1684; 6 L Ed 2d 1081).

In the instant case Mr. and Mrs. Bunker were the sole owners of the house. Defendant did not have a financial interest. The basement was a common area for the family, all members having equal access. The items that were seized were a high chair and a storage box, both apparently owned by defendant's parents, and several cartridge casings from the floor and a bullet, found in the storage box, which had penetrated the high chair and the outside of the storage box.

In *Morris* v. *Commonwealth* (1948), 306 Ky 349 (208 SW2d 58), the court stated, p 60:

"The next complaint concerning the evidence is that the cartridge case or empty shell shown to have been fired by the rifle tested was found in a search of appellant's residence which was neither authorized by warrant nor by consent of appellant. Appellant lived in the home of his father. The officers who searched the dwelling asked the father, who was the head of the house, for permission to search the house; he consented to the search, and the evidence obtained was found in the kitchen which was under the control of the father. We invariably have held that the head of a house, or the one in charge of the house at the time a search is made, may consent to its search, and such consent will render competent

the evidence thus obtained. It is not necessary for the defendant himself to give consent, unless he is the head of the house or in charge of the premises at the time the officers commence the search."

More recently in *United States* v. *Roberts* (ED Ark, 1963), 223 F Supp 49; *aff'd* (CA 8, 1964), 332 F2d 892; *cert denied* 380 US 980 (85 S Ct 1344; 14 L Ed 2d 274), the police had received consent from defendant's wife for a warrantless search. There the police were seeking a spent bullet lodged in the ceiling of defendant's home in an effort to determine whether it came from the same gun which fired the fatal shot. After a review of the authority, the court concluded p 59:

"If a general rule must be extracted from the cases cited above and many others which might have been cited, it may be said with some degree of assurance that assuming a truly voluntary and understanding consent or authorization the same is sufficient to validate a search *if given by a person who is in the sole possession or has sole control of the premises in question or who has an equal right with the defendant or suspect to the possession or control of the premises, provided that the search is limited to the general premises* and does not involve entry into portions of the premises obviously reserved to the exclusive use of the defendant or suspect or the opening or breaking into drawers, bureaus, boxes, trunks, or like containers used for the storage of his property or effects." (Emphasis supplied.)

Finally, it is significant that the United States Supreme Court did not question the right of a grandmother to consent to a search of her home for evidence incriminating her grandson who lived with her. *Bumper* v. *State of North Carolina* (1968), 391 US 543 (88 S Ct 1788; 20 L Ed 2d 797). Although the Court found a lack of consent on the part of the grandmother, it made reference to the

possible effect of her consent, had it been voluntary, by way of footnote at 548:

"Mrs. Leath owned both the house and the rifle. The petitioner concedes that her voluntary consent to the search would have been binding upon him. Conversely, there can be no question of the petitioner's standing to challenge the lawfulness of the search. He was the 'one against whom the search was directed,' *Jones* v. *United States,* 362 US 257, 261 (80 S Ct 725, 731; 4 L Ed 2d 697), and the house searched was his home. The rifle was used by all members of the household and was found in the common part of the house."

We conclude, therefore, that where the area to be searched is open to the common access of all members of the family,[1] that the homeowning parents have the right to consent to a search for items which may incriminate one of their children who is living at home.

The issue is thus reduced to the question of whether Mr. and Mrs. Bunker consented to the search.

Two points concerning consent to a search are firmly established in the law. First, the consent must have been specific and unequivocal, free and voluntary, and knowing and intelligent. Second, the burden is on the prosecutor to establish that such consent was given by clear and convincing evidence.

In *People* v. *Kaigler* (1962), 368 Mich 281, the Court stated p 294:

"[S]uch waiver or consent must be proved by clear and positive testimony *and there must be no*

---

[1] That the search was limited to an area open to equal use by all members of the family makes the instant case clearly distinguishable from *People* v. *Overall* (1967), 7 Mich App 153, where this Court held that a search of defendant's bedroom could not be consented to by defendant's grandmother.

*duress or coercion, actual or implied, and the prosecutor must show a consent that is unequivocal and specific, freely and intelligently given."*

Again, in *Bumper v. North Carolina* (1968), 391 US 543 (88 S Ct 1788; 20 L Ed 2d 797), and *People v. Smith* (1969), 19 Mich App 359, it was held that the prosecution has the burden of proving that consent was freely and voluntarily given, when it seeks to rely upon consent to justify a warrantless search. In *People v. Smith, supra,* p 369, we noted "the familiar principle that waiver is the intentional relinquishment or abandonment of a known right." See, also, *People v. Shaw* (1968), 9 Mich App 558.

The standard of review on appeal is whether the trial court was clearly erroneous in its conclusions. *People v. Hummel* (1969) 19 Mich App 266; GCR 1963, 517.1, 785.1. As this Court noted in *Hummel*[2] p 270:

"Thus, this Court will give deference to trial courts' findings, especially where the demeanor of the witnesses is important, as where credibility is a major factor. However, while the trial courts' findings will guide us, we are not bound by them."

By way of footnote, p 270 we stated:

"Under the 'clearly erroneous' standard * * * a trial judge can be reversed even though there was sufficient evidence to lead a reasonable man to the same result, if we are of 'the definite and firm conviction that a mistake has been committed.' "

Keeping in mind these various standards, from our review of the record made at the evidentiary hearing, we are unable to say that the trial court

[2] See, also, *People v. Smith* (1969), 19 Mich App 359, where this Court stated beginning p 367:

"In reviewing a trial judge's ruling on an issue involving asserted deprivation of a constitutional right, an appellate court is obliged itself to review the evidence and to make its determination guided but not controlled by the trial judge's factual determination."

was clearly erroneous. The record reveals that the investigating officer, Patrolman Wilk, who was not in police uniform, went to defendant's home several days after his arrest. The visit was made during the day and both Mr. and Mrs. Bunker were home as defendant's father worked a later shift.

The officer talked with the Bunkers for nearly 45 minutes both asking and answering questions about defendant, the case and news reports which the Bunkers had heard on the television covering the shooting. During the course of the conversation the fact arose that defendant had been doing some "target practicing" in the basement several weeks prior to the crime. Apparently, however, no search was made at this time.

The next day pursuant to an appointment with defendant's parents, Patrolman Wilk and another officer made a brief search of the basement in the presence of the Bunkers, after receiving their permission. The officers then received Mr. Bunker's written permission to take the items in question; however, no attempt was made to remove them.

Rather, the Bunkers were requested to first meet with the prosecuting attorney. This was done and the transcript of the meeting reveals numerous statements by the Bunkers that they had no objections to either a search or seizure.

Only after these numerous precautions were taken did the police seize the high chair and storage box along with the fired bullets and empty shell casings.

Moreover, there are the repeated admissions throughout the evidentiary hearing at trial by both parties that at the time of the search they had no objections to the search or of the taking of the items. Finally, Mrs. Bunker actually helped in the search[3]

---

[3] Mention of this fact is not meant to imply that had there been an atmosphere of coercion and duress, helping in the search

which produced the spent bullet in the storage box
and she also gave the police two additional items
unrelated to the search which they had not known
existed and which they were in fact surprised to
learn of.

In *United States* v. *Roberts, supra,* at p 59, the
Court stated:

"In cases of this kind courts are not concerned
ultimately with whether the person giving the con-
sent, whether the wife, employer, landlord, or a per-
son standing in some other relation to the person
at whom the search is being directed, was the
agent of such person or had authority from him,
but rather with the question of *whether the officers
making the search and effecting the seizure acted
fairly and reasonably on the one hand, or unfairly,
oppressively, or unreasonably on the other hand."*
(Emphasis supplied.)

Here the record indicates that the police acted in
a courteous and reasonable manner pursuant to mul-
tiple consents, both written and oral, made both to
them and the prosecuting attorney. The search was
neither a general search of the entire house nor
rigorous.

The defendant emphasizes that the police made no
effort to obtain a search warrant despite the ex-
istence of ample probable cause. In cases too nu-
merous to mention it has been recognized that courts
favor the use of warrants. We would, thus, nor-
mally agree that the failure to obtain a warrant
where one was easily obtainable, weighs against an
attempt by the prosecutor to characterize a warrant-
less search as reasonable.

In the instant case, however, there is a serious
question as to whether a warrant was available to

would have meant that consent was given. *Cf. People* v. *Smith* (fn
2).

the police. The statutes governing the issuance of search warrants in December, 1966,[4] when the search was conducted, did not explicitly provide for warrants to search for evidence of a crime.[5] The record on appeal includes an affidavit by an assistant prosecuting attorney stating that in the instant case the police sought a search warrant, but were advised by the affiant that one could not be issued for the search of evidence and that a search could only be conducted with the consent of those persons lawfully in possession of the premises. We note the good-faith attempt by the police to obtain a search warrant as a further indication of their efforts to abide by the law.

We conclude that the search and seizure were lawful and that the evidence produced was properly admitted at trial.

Several witnesses were produced at trial who testified that approximately one or two months prior to the crime, they saw defendant in the possession of a gun similar to the murder weapon and were present in defendant's basement when the spent bullets, later found by the police, were fired. The testimony was admitted over objection below.

On appeal defendant attacks the trial court's admission of the evidence on the grounds that none of the witnesses was able to positively identify the gun, that "it is testimony dealing with a time period which is too remote" and that it was irrelevant and immaterial.

---

[4] CL 1948, §§ 776.1, 776.2 (Stat Ann 1954 Rev §§ 28.1259, 28-.1260); MCLA §§ 28.433, 750.238 (Stat Ann 1962 Rev §§ 28.99, 28.435).

[5] This was in accordance with the "mere evidence" rule followed in many jurisdictions. See generally: 47 Am Jur, Search and Seizures, § 54, p 534. *Cf.* MCLA § 780.652 (Stat Ann 1969 Cum Supp § 28.1259[2]), effective March 10, 1967, which provides: "A warrant may be issued to search for and seize any property or other thing which is either: * * * (d) Evidence of a crime or criminal conduct on the part of any person."

The witnesses testified to several similarities between the murder weapon and the gun seen in defendant's possession. Both were pistols of the same design with wooden handles and chrome plated barrels. The inability to make a positive identification affected the weight and not the admissibility of the evidence. See generally: 31 Am Jur 2d, Expert and Opinion Evidence, § 126, p 668.

Questions of relevance, materiality and remoteness are generally left to the sound discretion of the trial court.[6] Qualified expert testimony was adduced at trial showing that the spent bullet found in the basement and the fatal shot were fired by the same gun. The trial court was, thus, clearly correct in admitting testimony which tended to link defendant to the murder weapon over objections of irrelevance and immateriality.

Defendant testified in his own behalf at trial. On cross-examination the prosecutor in attempting to attack defendant's credibility, asked:

"*Q*: Did you in the company of any of those names I mentioned attempt to break out of the Macomb County Jail on or about the 12th day of March, 1967?

"*A*: I was in the company of them, yes sir."

The question was permitted over defendant's objection. On redirect examination defendant denied taking an active part in attempting to saw through the cell bars. The prosecutor introduced a rebuttal witness who testified that he saw defendant help in the sawing.

On appeal defendant argues that evidence about the attempted jail break was erroneously introduced.

The evidence of defendant's attempted escape was properly placed before the jury. Michigan authority

---

[6] See *People* v. *Charles Williams* (1969), 15 Mich App 683; 29 Am Jur 2d, Evidence, § 251, p 299.

is uniform that such evidence, while not admissible as substantive proof of guilt, can be introduced to show defendant's state of mind.[7]  Defendant's argument that the prior cases are distinguishable, on the grounds that they involve successful escapes as opposed to the attempted, but unsuccessful, escape in the instant case, is without merit.  It is the effort to escape custody which is relevant, not the fortuitous result of success or failure.

Defendant further argues on appeal that the trial court's instruction to the jury on the effect to be given his attempted jail break was erroneous.  He also attacks the court's instruction regarding presumptions arising from the use of a deadly weapon.

Although given the specific opportunity by the trial court, this objection to the instructions was not raised by defendant below.  Defendant's failure of timely objection waives any possible right he might have had to object now to the instructions.  *People* v. *Allar* (1969), 19 Mich App 675; *People* v. *Mallory* (1966), 2 Mich App 359; GCR 1963, 516.2.

Finally, defendant contends that the evidence adduced at trial was insufficient for a jury to find him guilty of first-degree murder.

Our review of the record satisfies us that sufficient evidence was produced which, if believed, justified the jury's belief of the following facts.  Defendant drove a car which he had stolen that afternoon into the gasoline station although its tank was already three-quarters full.  The decedent, Alan Pringle, a young man with a pronounced limp who was required to carry a moderate sum of cash on his person as part of his employment, serviced the car

---

[7] See: *People* v. *Cleveland* (1895), 107 Mich 367; *People* v. *Haxer* (1906), 144 Mich 575; *People* v. *Cipriano* (1927), 238 Mich 332; 1 Gillespie, Michigan Criminal Law and Procedure (2d ed), § 420, p 502; 2 Wigmore, Evidence (3d ed), § 276; 29 Am Jur 2d, Evidence, § 285, p 332.  See, also, *People* v. *Jones* (1965), 1 Mich App 633.

and went to the driver for payment. The station manager, who did not see or hear any indication of an argument between defendant and decedent, saw money falling from Pringle's hand immediately after hearing the gunshot. Defendant then fled and made every effort to escape, including avoidance of a police roadblock and a 110-mile-an-hour chase over a considerable distance. From these facts the jury could reasonably have inferred an attempted armed robbery which ended in Pringle's death.

Defendant testified that the shooting accidentally occurred when he and Pringle got into an argument and defendant tried to defend himself from decedent's physical assaults. The jury was presented with an issue of fact. The evidence justified its resolution against defendant.[7]

Affirmed.

All concurred.

---

[7] For the well settled standard of review of jury verdicts, see *People* v. *Eagger* (1966), 4 Mich App 449; *People* v. *Arither Thomas* (1967), 7 Mich App 103; 2 Gillespie (2d ed), Michigan Criminal Law and Procedure, § 807, p 1054.