PEOPLE *v.* MASON

1. SEARCHES AND SEIZURES—REASONABLENESS—RAISING OF ISSUE—DEFENDANT'S STANDING.

   A defendant's standing to raise the issue of an unreasonable search and seizure depends upon the facts of his case.

2. SEARCHES AND SEIZURES — WARRANTLESS SEARCH — GUEST — PRIVACY INTEREST — DEFENDANT'S STANDING.

   Defendant had a sufficient privacy interest in a room which he occupied as a guest to give him standing to challenge the legality of a warrantless search of that room.

3. ABANDONMENT—ELEMENTS—QUESTION OF FACT.

   Abandonment of premises is a question of fact based upon a combination of act and intent.

4. ABANDONMENT—EVIDENCE—BURDEN OF PROOF.

   Proof of abandonment of premises must be made by the one asserting it by clear, unequivocal and decisive evidence.

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 10]  47 Am Jur, Searches and Seizures §§ 7, 8, 11, 25.
   29 Am Jur 2d, Evidence §§ 418–424.
[2]  47 Am Jur, Searches and Seizures § 16.
   29 Am Jur 2d, Evidence §§ 418, 419.
[3]  1 Am Jur 2d, Abandoned, Lost, and Unclaimed Property §§ 38, 39.
[4, 5]  1 Am Jur 2d, Abandoned, Lost, and Unclaimed Property §§ 15, 36, 39.
[6]  47 Am Jur, Searches and Seizures § 9.
[7, 8]  29 Am Jur 2d, Evidence § 415.
[9]  29 Am Jur 2d, Evidence §§ 425–427.
[10]  47 Am Jur, Searches and Seizures § 25.
[11]  47 Am Jur, Searches and Seizures § 31.
[12]  47 Am Jur, Searches and Seizures § 23.
   29 Am Jur 2d, Evidence § 425.
[13]  47 Am Jur, Searches and Seizures §§ 21–25.
[14]  5 Am Jur 2d, Appeal and Error § 891.

5. ABANDONMENT—EVIDENCE—FLIGHT—BURDEN OF PROOF.

Flight to avoid prosecution standing alone does not meet a prosecutor's duty to produce clear, unequivocal and decisive evidence of abandonment of premises.

6. SEARCHES AND SEIZURES—CONSTITUTIONAL LAW—FOURTH AMENDMENT—SEPARABILITY.

The Fourth Amendment prohibits both unreasonable searches and unreasonable seizures and its protection extends to both houses and effects; consequently, these two prohibitions are separable in the sense that there need not be both a search and a seizure before that amendment applies (US Const, Am 4).

7. SEARCHES AND SEIZURES—EVIDENCE—EXCLUSIONARY RULE.

The exclusionary rule relating to illegal searches and seizures applies to information, tangible or not, obtained through an illegal search.

8. SEARCHES AND SEIZURES—EVIDENCE—EXCLUSIONARY RULE—PURPOSE.

The basic purpose behind the exclusionary rule relating to illegal searches and seizures is to deter illegal activities on the part of the government by making any evidence obtained through such actions totally useless.

9. SEARCHES AND SEIZURES—EVIDENCE—ILLEGALLY SEIZED EVIDENCE—USAGE.

Illegally seized evidence may not be used in cross-examining a defendant or for rebutting his testimony.

10. SEARCHES AND SEIZURES—LEGALITY OF SEARCH—EVIDENTIARY HEARING.

An evidentiary hearing is required to determine the legality of a warrantless search where a trial court holds that a defendant lacked standing to raise the issue of its legality, thus never affording an opportunity to the prosecution to justify that search since absent an opportunity for such justification, the Court of Appeals will not assume that a warrantless search was illegal.

11. SEARCHES AND SEIZURES—WARRANTLESS SEARCH—REASONABLENESS—EVIDENCE—BURDEN OF PROOF.

The prosecution must prove that a warrantless search is reasonable and, in the absence of any emergency, there must be compelling reasons to justify the absence of a search warrant.

12. SEARCHES AND SEIZURES—WARRANTLESS SEARCH—ARREST—PROBABLE CAUSE.
    Probable cause to believe that defendant killed his wife did not legalize a warrantless search of his room.

13. SEARCHES AND SEIZURES—WARRANTLESS SEARCH—ARREST.
    Permissible warrantless searches are the exception and are allowed only as an incident to an arrest or where the exigencies of a situation make the warrant requirement itself unreasonable.

14. APPEAL AND ERROR—JURY—INSTRUCTIONS—FAILURE TO OBJECT.
    Failure to object at trial to jury instructions waives any possible right to object to those instructions on appeal.

Appeal from Recorder's Court of Detroit, Elvin L. Davenport, J. Submitted Division 1 March 3, 1970, at Detroit. (Docket No. 6,884.) Decided March 25, 1970. Leave to appeal denied September 1, 1970. 383 Mich 826.

Martin Mason was convicted of second-degree murder. Defendant appeals. Remanded.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, and *Angelo A. Pentolino,* Assistant Prosecuting Attorney, for the people.

*Arthur J. Tarnow* (Defenders' Office—Legal Aid and Defender Association of Detroit), for defendant on appeal.

Before: LESINSKI, C. J., and QUINN and V. J. BRENNAN, JJ.

LESINSKI, C. J. Defendant Martin Mason was convicted of second-degree murder (MCLA § 750.317 [Stat Ann 1954 Rev § 28.549]), following a jury trial. The conviction arose from the fatal shooting of defendant's wife, Yvonne Mason, in the early

morning of March 6, 1968. Defendant brings this appeal as of right.

The facts surrounding the shooting are as follows. Defendant had spent the evening of March 5 in the bar where his wife was employed as a barmaid. After the bar closed an acquaintance drove them to where defendant was staying. Upon arriving, however, Yvonne Mason asked the driver to take her to her aunt's home. Defendant stated that his wife's feelings were hurt because he had been kidding her about drinking on the job and getting fat.

Defendant called a cab and followed his wife to her aunt's home. Defendant apparently was not on the best of terms with the aunt and demanded that Yvonne leave with him.

From the aunt's home they went to the nearby home of a common acquaintance, Mrs. McNeal. After being admitted, Yvonne sat down in the living room while defendant and Mrs. McNeal made light conversation for a few moments. Defendant then put some coins in a juke box, started the records playing, and sat down on the couch in the living room.

Yvonne then stated that her ankle was sore and defendant asked whether she wanted him to take her to a hospital. At his suggestion Yvonne got up and walked around the room, testing her ankle. She then sat down on the couch, next to her husband.

Conversation between defendant and decedent followed. Although Mrs. McNeal testified that she "couldn't tell whether they were friendly or not," she did state several times that they were not arguing but only talking with each other. She also stated that they were not talking in loud voices. Mrs. McNeal retired to her bedroom after a short while.

Defendant testified that he took out the gun he had been carrying around during the evening and emptied the bullets onto the floor. He testified that "I looked at the gun and it was empty. So I don't know why, I just clicked the gun, I clicked it and leaned back the way I was sitting and I clicked it again." Defendant denied knowingly or intentionally pointing the gun at his wife.

Mrs. McNeal testified that she heard the "clicking" and returned to the room adjacent to the living room. She stated that she heard defendant say: "All I have to do is click it one more time."

Defendant denied making the statement. Rather, he testified that the clicking was making his wife nervous and she told him to put the gun away. He testified that scaring her seemed "amusing" at the time, and clicked the gun again.

Mrs. McNeal testified that after she returned from the bedroom she heard two more clicks and then the gun went off. She then asked what had happened and defendant replied that he had shot his wife and told Mrs. McNeal to call the police.

Shortly after the shooting defendant fled the scene, but turned himself into the police five days later and was arrested.

It was defendant's position at trial that he thought he had taken all the bullets out of the gun and that the shooting was accidental. In support of his position defendant took the witness stand and testified that he and his wife were on generally good terms and that they were living together during the week before the shooting.

The evidence presented a difficult factual question as to whether malice was present making this act second-degree murder or whether the act was an intentional aiming of the gun without malice,

constituting manslaughter.[1]  Of great importance
was defendant's state of mind, his feelings toward
his wife and his credibility.  The prosecutor's cross-
examination of defendant centered around an at-
tempt to show animosity between defendant and
his wife during the morning of March 6 and the
days preceding the shooting.

In the course of his testimony defendant stated
that his wife was living with him at his room during
the week prior to her death, that she had spent
the night before with him, that she had left directly
from there for work on March 5 and that she
would have returned home that night but for his kid-
ding her about her drinking and weight.  To rebut
this testimony and attack defendant's credibility,
the prosecutor introduced the testimony of the in-
vestigating police officer regarding what he saw
during a search of defendant's room the day after
the shooting.  The officer stated that he found de-
fendant's clothing in the room but that no woman's
clothing or any other indication of a woman's pres-
ence existed.  The evidence, thus, tended to prove
that defendant's wife had not been living with him
and that he had been lying on the witness stand.

The officer's testimony was argued to the jury
by the prosecutor during summation:

"Now the defendant testified at the time of the
incident the deceased was living with him on Little-
field, in fact she had lived there for the past four
days.

"You heard the testimony of Detective Mason.
He testified he went there and went there the next

---

[1] MCLA § 750.329 (Stat Ann 1954 Rev § 28.561).

"Any person who shall wound, maim or injure any other person
by the discharge of any firearm, pointed or aimed, intentionally
but without malice, at any such person, shall, if death ensue from
such wounding, maiming or injury, be deemed guilty of the crime
of manslaughter."

day, the day of the shooting, March 6, 1968 and he searched the bedroom in which the defendant had lived. And he found men's clothing, one suit, one topcoat, but he didn't find one stitch of women's clothing in that bedroom.

"Now, it seems to me that a woman who had lived with her man, her husband, for some 12 days, in fact, he testified she intended to return with him that evening would leave clothing, something, an article in that home in which she was living and which the testimony of Martin Mason indicates she was living."

Defendant timely objected to the introduction of the rebuttal evidence on the grounds that it was obtained by a warrantless search in violation of the Fourth Amendment. The objection was denied below.

The principal issue on appeal is whether the evidence obtained by the warrantless search was properly admitted to rebut defendant's testimony.

At trial when the issue of the validity of the search which was the basis for the objected to testimony was raised, the trial court ruled that defendant lacked standing to raise the issue of the legality of the search.[2] The prosecutor asserts this position on appeal.

Whether or not a particular defendant has standing to raise the issue of an unreasonable search and seizure depends on the facts of the case. While the record is not entirely clear, it does appear that the room searched was in a home owned by defendant's cousin. Defendant held no financial interest

---

[2] In deciding the question the trial court stated:
"*The Court:* The proper person to object to that would be the householder. I don't think he can—the householder would be the one to complain."
And again:
"*The Court:* I will say—I have said what I have to say about that. The people who could properly complain to the search would be the householder, not him, unless it was his household."

in the house. He, and allegedly his wife, had been using the room, however, for approximately four or five days prior to the killing. Defendant left his clothing and his personal papers there when not present.

Although a body of law relative to search and seizure, based largely on gambling and prohibition cases, exists in Michigan,[3] the issue raised in the instant case is not answered. Some authorities make the general statement that "guests in a home are not entitled to claim constitutional immunity against search of premises where the owner himself does not object to the search."[4] Our review of the cases, however, convinces us that this statement is overly broad. The mere designation of a defendant as a "guest" cannot end the inquiry.

In *People* v. *Azukauckas* (*supra,* footnote 4), the defendant who was merely a guest for a few hours at the homeowner's Saturday evening party, sought to attack the legality of a search. The Court held that the guest lacked standing.

However, in *People* v. *Gonzales* (1959), 356 Mich 247, where the defendant who sought to raise the constitutionality of a search of an automobile was only a passenger, with no apparent financial interest in the car, the Court held that defendant had standing to raise the issue. The Court stated at 257 :

"Further, we believe that on the facts in this case defendant had the right to raise the constitutional objection. There is no showing of any waiver of the

---

[3] See, generally, *People* v. *Norwood* (1945), 312 Mich 266; *People* v. *Oaks* (1930), 251 Mich 253; *People* v. *Bartoletta* (1929), 248 Mich 499; *People* v. *Azukauckas* (1927), 241 Mich 182; *People* v. *Anscomb* (1926), 234 Mich 203; *People* v. *Hale* (1967), 1 Mich App 127.

[4] 2 Gillespie, Mich Criminal Law & Procedure (2d ed), § 873, p 1142, citing *People* v. *Azukauckas* (1927), 241 Mich 182.

objection by anyone. And *though defendant apparently had only the status of a passenger,* when the first requirement of the search (and a material one to its outcome) was that defendant remove himself from the seat in the automobile where he had a right to be, we regard the search as directly affecting him." (Emphasis supplied.)[5]

There is a fundamental difference between the "guest" in *Azukauckas* and the "guest" in the instant case, who was staying with a relative for several days and had his own room. The difference centers largely on the degree of privacy the two "guests" were entitled to in the area searched.

In *Jones v. United States* (1960), 362 US 257 (80 S Ct 725; 4 L Ed 2d 697), defendant sought to suppress evidence found during a search of an apartment. Defendant testified that the apartment belonged to a friend who had given him the use of it and who had loaned him a key. Although he had a suit and shirt at the apartment, his home was elsewhere, he paid nothing for the use of the apartment, he had slept there "maybe a night" and the owner only let him use it "as a friend." At the time of the search the owner had been away for about five days. The government challenged defendant's standing because he had alleged neither ownership of the seized property (narcotics) "nor an interest in the apartment greater than that of an 'invitee' or guest.'" 362 US at p 259 (80 S Ct at p 730; 4 L Ed 2d at p 701).

In rejecting the government's argument the Court in *Jones* acknowledged its departure from a sub-

---

[5] Compare *People v. Lovins* (1968), 10 Mich App 524, where this Court in an opinion signed by this writer, reached an opposite result grounding its holding on the lack of presence. A rereading of the opinion at this time convinces the writer he was in error in signing same as it is violative of the rule laid down in *People v. Gonzales* (1959), 356 Mich 247, which was not considered by the Court in *Lovins.*

stantial number of lower court opinions. Beginning at p 266 (80 S Ct at p 733; 4 L Ed 2d at p 705), the Court stated:

"We do not lightly depart from this course of decisions by the lower courts. We are persuaded, however, that it is unnecessary and ill-advised to import into the law surrounding the constitutional right to be free from unreasonable searches and seizures subtle distinctions, developed and refined by the common law in evolving the body of private property law which, more than almost any other branch of law, has been shaped by distinctions whose validity is largely historical. * * * *Distinctions such as those between 'lessee,' 'licensee,' 'invitee' and 'guest,' often only of gossamer strength, ought not to be determinative in fashioning procedures ultimately referable to constitutional safeguards.*

"We rejected such distinctions as inappropriate to the law of maritime torts * * * . * * * *A fortiori* we ought not to bow to them in the fair administration of the criminal law. To do so would not comport with our justly proud claim of the procedural protections accorded to those charged with crime. *No just interest of the Government in the effective and rigorous enforcement of the criminal law will be hampered by recognizing that anyone legitimately on premises where a search occurs may challenge its legality by way of a motion to suppress, when its fruits are proposed to be used against him.*" (Emphasis supplied.)

We conclude that defendant had a sufficient privacy interest in the room searched to give him standing to challenge the legality of the search.

It is also the prosecutor's contention, however, that defendant lacks standing due to his "previous abandonment of this room at the time of the search." *Parman* v. *United States* (1968), 130 App DC 188 (399 F2d 559), and *Friedman* v. *United States* (CA

8, 1965), 347 F2d 697, *cert denied* (1965), 382 US 946 (86 S Ct 407; 15 L Ed 2d 354), are cited by the prosecutor.

Neither the record below nor the authority cited support the prosecutor's position. As the court pointed out in *Friedman,* abandonment is a question of fact based on a combination of act and intent. The court stated at 704:

" '* * * An abandonment must be made to appear affirmatively by the party relying on it, and an intention to abandon will not ordinarily be presumed, and this is particularly true if the conduct of the owner can be explained consistently with a continued claim. Proof of abandonment must be made by the one asserting it by clear, unequivocal and decisive evidence.' "

In both *Friedman* and *Parman* the prosecution clearly met its burden of proof.[6] In the instant case,

---

[6] The facts proving abandonment in *Friedman* v. *United States* (CA 8, 1965), 347 F2d 697, were set out by the court at p 704:

"Briefly summarized, we find the following:

"1. The dance studio closed about the middle of May 1962.

"2. Back rent covering periods prior to the closing of the studio remained unpaid.

"3. The studio's attorney advised Thorpe Brothers, agents for the landlord, sometime in May 1962 that they could no longer continue in business and would get out as soon as possible.

"4. Thorpe Brothers, Inc., was informed by the attorney for the studios that they could sue if they wanted to but that there wasn't any money to be obtained therefrom.

"5. Sometime during May 1962 Miss Peterson, with the help of other defendants, took from the studio all the active files and the furniture.

"6. Inactive files were taken from the filing cabinets and left on the floor of the studio and in a metal trash barrel.

"7. Kay Peterson, who had been managing the studio business, testified that when she left the studio on May 18th 'My only thought was that I was closing the door for the last time.'

"8. The premises appeared on Thorpe Brothers' list of properties for rent as of June 1, 1962.

"9. For rent signs were placed in the windows.

"10. Defendants, through their attorney, had notified the landlord's agent that they were out of business and could not even pay the past due rent.

however, beyond the sole fact that defendant did not return to the room between the night of the shooting and his arrest five days later, there is nothing on the record indicating abandonment.[7] Flight to avoid prosecution standing alone does not meet the prosecutor's duty to produce "clear, unequivocal and decisive evidence" of abandonment.

We conclude, therefore, that within the facts of the instant case that defendant was the person aggrieved by the search, the person against whom the search was directed, and a person with sufficient, unabandoned, interests in the room to have standing.[8] We, therefore, turn to the merits of defendant's attack.

The prosecution argues that although a thorough search of the room was made and some of defend-

---

"11. On July 24, 1962, the postal inspector, after first obtaining permission from Thorpe Brothers, entered and seized.

"12. Much of the seized property was used in the trial and to obtain the names of 'victims' who subsequently appeared and testified for the government.

"Additional testimony, which we find it unnecessary to recite here, lends support to the trial court's conclusion that the property seized had been abandoned by its owners."

In *Parman* v. *United States* (1968), 130 App DC 188 (399 F2d 559), the court stated at p 193 (p 564):

"The finding of abandonment was premised on the fact that appellant fled Washington almost immediately after the crime was committed and was in Ohio, registered under an assumed name at a tourist home, when the search occurred. He thereupon sold his car and appeared in Los Angeles where he also engaged an apartment under another assumed name through a lease which extended beyond the period of time for which the tenancy of his Washington apartment had been fixed. While in Los Angeles, appellant sought a job and bought furniture and clothing."

[7] It might be noted, moreover, that defendant's leaving his clothing and papers in the room during the five days, tends to indicate an intent to return.

[8] In *Jones* v. *United States, supra,* at p 261 (80 S Ct at p 731; 4 L Ed 2d at p 702), the Court notes:

"In order to qualify as a 'person aggrieved by an unlawful search and seizure' one must have been a victim of a search or seizure, one against whom the search was directed, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else."

ant's papers were seized,[9] that the Fourth Amendment does not apply because only the "observations" made, and not the tangible items seized, were used against defendant at trial. Therefore, even if there was an illegal search, it is contended that the Fourth Amendment is inapplicable.[10]

The Supreme Court stated in *United States* v. *Jeffers* (1951), 342 US 48, 51 (72 S Ct 93, 95; 96 L Ed 59, 64), "The Fourth Amendment prohibits *both un-*

[9] The testimony of the officer making the search was that some items were seized. He described the search:

"*A.* There was a suitcase; and the bedroom area had papers in it that indicated that it belonged to the defendant in this matter. There were numerous papers; in fact, I confiscated some. I checked the closet of this particular bedroom and there was one man's suit, a topcoat and a pair of man's trousers, the only clothing in the room."

[10] The prosecutor also argues that the evidence seized was not of a testimonial or communicative nature and its introduction did not compel defendant to testify against himself. The prosecution cites *Schmerber* v. *California* (1966), 384 US 757 (86 S Ct 1826; 16 L Ed 2d 908). Although we consider *Schmerber* irrelevant to the instant case to the extent that it arguably is relevant, it cuts against the position of the prosecutor. The Court in *Schmerber* held at p 765 (86 S Ct at p 1833; 16 L Ed 2d at p 916) that "Since the blood test evidence * * * was neither petitioner's testimony nor evidence relating to some communicative act or writing by the petitioner it was not inadmissible" on *Fifth Amendment* grounds. However, the Court went on to specifically hold that the evidence was subject to the *Fourth Amendment*, stating at p 767 (86 S Ct at p 1834; 16 L Ed 2d at pp 917, 918):

"The values protected by the Fourth Amendment thus substantially overlap those the Fifth Amendment *helps to protect.* History and precedent have required that we today reject the claim that the self-incrimination clause of the Fifth Amendment requires the human body in all circumstances to be held inviolate against state expeditions seeking evidence of crime. But if compulsory administration of a blood test does not implicate the Fifth Amendment, it plainly involves the broadly conceived reach of a search and seizure under the Fourth Amendment. * * * *It could not reasonably be argued, and indeed respondent does not argue, that the administration of the blood test in this case was free of the constraints of the Fourth Amendment.* Such testing procedures plainly constitute searches of 'persons,' and depend antecedently upon seizures of 'persons,' within the meaning of that Amendment." (Emphasis supplied.)

The Court added at p 770 (86 S Ct at p 1835; 16 L Ed 2d at p 919):

"Search warrants are ordinarily required for searches of dwellings, and absent an emergency, no less could be required where intrusions into the human body are concerned."

*reasonable searches and unreasonable seizures,* and its protection extends to *both 'houses' and 'effects.'"* (Emphasis supplied.) Thus, the provisions of the Fourth Amendment are separable in the sense that there need not be both a search and a seizure before the Amendment applies.

In the instant case if there was an illegal search, defendant has the benefit of the exclusionary rules set forth in *Mapp* v. *Ohio* (1961), 367 US 643 (81 S Ct 1684; 6 L Ed 2d 1081). Due to the ruling of the trial court that defendant lacked standing and our disposition of the case set forth below, we do not determine whether there was an illegal search.

Moreover, the fact that the product of the search was only the "observations" of the police, as opposed to tangible evidence, is legally irrelevant. The exclusionary rule applies to information, tangible or not, obtained through an illegal search. As noted in *Wong Sun* v. *United States* (1963), 371 US 471, 485 (83 S Ct 407, 416; 9 L Ed 2d 441, 454):

"The exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion. It follows from our holding in *Silverman* v. *United States* (1961), 365 US 505 (81 S Ct 679; 5 L Ed 2d 734), that the Fourth Amendment may protect against the overhearing of verbal statements as well as against the more traditional seizure of 'papers and effects.' *Similarly, testimony as to matters observed during an unlawful invasion has been excluded in order to enforce the basic constitutional policies. McGinnis* v. *United States* (CA 1, 1955), 227 F2d 598." (Emphasis supplied.)

And in *McGinnis* v. *United States* (CA 1, 1955), 227 F2d 598, cited in *Wong Sun,* the court stated at p 603:

"We find no basis in the cases or in logic for distinguishing between the introduction into evidence of physical objects illegally taken and the introduction of testimony concerning objects illegally observed. We are aware of no case which makes this distinction. Moreover, it seems to us that the protection afforded by the Constitution against unreasonable search and seizure would be narrowed down to a virtual nullity by any such view of the law, which in effect would grant to the victims of unreasonable search and seizure the rather unsubstantial right to be convicted on the basis of evidence which was illegally observed rather than evidence which was illegally taken."[11]

The prosecutor argues, however, that even if the evidence was illegally obtained and the Fourth Amendment does apply, the evidence was still admissible, citing *Walder* v. *United States* (1954), 347 US 62 (74 S Ct 354; 98 L Ed 503). There the government had obtained evidence of narcotics possession through an illegal search and seizure in 1950. Defendant successfully moved for the suppression of the evidence and shortly thereafter the case was dismissed. Two years later, defendant again was indicted due to an independent and unrelated narcotics transaction. Defendant took the witness stand at trial and testified "I have never sold any narcotics to anyone in my life," and that he had never possessed narcotics. The Court held the introduction of the evidence illegally seized in 1950 for impeachment permissible because (at p 65 [74 S Ct at p 356; 98 L Ed at p 507]) "defendant went

---

[11] The "plain view" rule announced in *People* v. *Kuntze* (1963), 371 Mich 419, and *People* v. *McDonald* (1968), 13 Mich App 226, of course, has no applicability in the instant case. The basic question here is whether the police were acting legally when they entered the room in the first place. Such cases as *People* v. *Panknin* (1966), 4 Mich App 19, and *People* v. *Tetts* (1967), 6 Mich App 254, clearly indicate that when the evidence was observed the officer was "in a place where he has a lawful right to be." *Panknin* at p 28.

beyond a mere denial of complicity in the crimes * * * and made the sweeping claim that he had never dealt in or possessed any narcotics."

There is, however, a serious question as to whether *Walder* is still good law,[12] or whether the reasoning it was based on is still tenable.

The original theory behind the decision was stated at p 65 (74 S Ct at p 356; 98 L Ed at p 507):

"It is one thing to say that the government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths. Such an extension of the *Weeks* doctrine would be a perversion of the Fourth Amendment.

"* * * Of course, the constitution guarantees a defendant the fullest opportunity to meet the accusation against him. He must be free to deny all the elements of the case against him without thereby giving leave to the government to introduce by way of rebuttal evidence illegally secured by it, and therefore not available for its case in chief. Beyond that, however, there is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the government's disability to challenge his credibility."

In this Court's recent case of *People* v. *Marsh* (1968), 14 Mich App 518, *rev* (1970), 383 Mich 495,[13]

---

[12] Even the prosecutor found it necessary to concede in his brief: "The trend of the United States Supreme Court since that date [1954] has been to severely narrow this exception to the exclusionary rule of evidence obtained in violation of the fundamental rights of the defendant."

[13] In *People* v. *Marsh* (1968), 14 Mich App 518, defendant's 1941 confession and admissions were used over objection to cross-examine him and for rebuttal at his retrial in 1966. The prosecutor did not contend that *Miranda* v. *Arizona* (1966), 384 US 436 (86 S Ct 1602; 16 L Ed 2d 694, 10 ALR3d 974), was inapplicable to a case

we were faced with the attempted use by the prose-
cution of  *  *  *  an illegally obtained confession
for cross-examination purposes.  In an extensive
discussion of *Walder* we expressed serious doubts
over its theoretical foundations.  At p 529 we stated:

"We note the practical difficulties likely to be
encountered in attempting to differentiate between
defendant's 'denial of the elements' and 'sweeping
claims.'  When a defendant takes the stand, com-
pletely responsive answers to all questions put to
him on direct and cross-examination are likely to
open up collateral matters.  [Citations omitted.]

"Here the trial court argued the necessity of using
the inadmissible statements for impeachment to pre-
vent defendant's perjury and test his credibility.
The defendant is no freer to perjure himself than
any other witness; if he does, he subjects himself
to prosecution for perjury.  The defendant, like any
witness, may be impeached.  'The State should be
free to impeach, but it ought to come by its impeach-
ment as legally as it accumulates its other evidence.'
*State* v. *Brewton* (1967), 247 Ore 241, 246 (422 P2d

---

"where the defendant was originally convicted prior to *Miranda*
and newly tried after *Miranda*." (*Marsh, supra,* pp 522, 523.) We
said at p 523: "Accordingly, that question is not before us and
is not decided. We intimate no opinion thereon. We defer con-
sideration of that question to a case where it has been properly
raised and briefed." Our opinion then went on to conclude that a
confession, which had been conceded by the prosecutor to have been
unlawfully obtained, could not be used for rebuttal or to cross-
examine the defendant.

Following our opinion, in *Jenkins* v. *Delaware* (1969), 395 US
213 (89 S Ct 1677; 23 L Ed 2d 253), and *People* v. *Woods* (1969),
382 Mich 128, the Supreme Courts of the United States and Michigan
held that pre-*Miranda* confessions could be used at retrials held
after *Miranda.*

On appeal to the Michigan Supreme Court, *Marsh, supra,* was
reversed. *People* v. *Marsh* (1970), 383 Mich 495. The Court stated
at p 496: "The instant case is resolved by our recent holding in
*People* v. *Woods*  *  *  *  and by *Jenkins* v. *Delaware*  *  *  * ."
Since this Court's opinion in *Marsh* was thus reversed on other
grounds, its precedential value regarding the issue of whether a
confession which is illegally obtained may be used for cross-examina-
tion or rebuttal is unaffected by the Supreme Court's reversal.

581, 583), *cert denied* (1967), 387 US 943 (87 S Ct 2074; 18 L Ed 2d 1328)."

Although we found it unnecessary in *Marsh* to decide whether we would reject *Walder* completely, we did conclude our discussion of the question by noting at p 530:

"We add that on principle the people should not be allowed to have admitted against a defendant who takes the stand evidence that would be inadmissible if he exercised his constitutional right to refrain from taking the stand. A contrary rule would unconstitutionally chill exercise of either the constitutional right to have improper evidence suppressed or the constitutional right to take the stand. [Citations omitted.]

" '[W]e find it intolerable that one constitutional right should have to be surrendered in order to assert another.' *Simmons* v. *United States* (1968), 390 US 377, 394 (88 S Ct 967, 976; 19 L Ed 2d 1247, 1259)."

If the reasoning of *Walder* is accurate then logically the prosecution should also be able to use an illegally obtained confession to attack credibility. Yet, in light of *Miranda* v. *Arizona* (1966), 384 US 436 (86 S Ct 1602; 16 L Ed 2d 694; 10 ALR3d 974), such use of an involuntary confession has been held impermissible.[14] We fail to see any logical basis for saying that evidence obtained in violation of the Fourth Amendment can be used for rebuttal, while evidence obtained in violation of the Fifth Amendment may not.

---

[14] *Groshart* v. *United States* (CA 9, 1968), 392 F2d 172; *Blair* v. *United States* (1968), 130 App DC 322 (401 F2d 387); *Proctor* v. *United States* (1968), 131 App DC 241 (404 F2d 819); *Wheeler* v. *United States* (CA 10, 1967), 382 F2d 998; *Fowle* v. *United States* (CA 9, 1969), 410 F2d 48; *State* v. *Brewton* (1967), 247 Ore 241 (422 P2d 581), *cert denied* (1967), 387 US 943 (87 S Ct 2074; 18 L Ed 2d 1328); *Commonwealth* v. *Padgett* (1968), 428 Pa 229 (237 A2d 209).

Moreover, the basic purpose behind the exclusionary rule is to deter illegal activities on the part of the government by making any evidence obtained through such actions totally useless. As noted in *Silverthorne Lumber Company, Inc.,* v. *United States* (1920), 251 US 385, 392 (40 S Ct 182, 183; 64 L Ed 319, 321):

"The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the court, *but that it shall not be used at all.*" (Emphasis supplied.)

To effectuate this purpose courts have held the products of illegal searches unusable in a wide variety of situations. As observed in *Walder* at pp 64, 65 (74 S Ct at p 356; 98 L Ed at pp 506, 507):

"The government cannot violate the Fourth Amendment  *  *  *  and use the fruits of such unlawful conduct to secure a conviction.  *  *  * Nor can the government make indirect use of such evidence for its case,  *  *  *  or support a conviction on evidence obtained through leads from the unlawfully obtained evidence,  *  *  *  . All these methods are outlawed, and convictions obtained by means of them are invalidated, because they encourage the kind of society that is obnoxious to free men." (Citations omitted.)

In *Terry* v. *Ohio* (1968), 392 US 1 (88 S Ct 1868; 20 L Ed 2d 889), the Court stated at p 13 (88 S Ct at p 1875; 20 L Ed 2d at p 901):

"A ruling admitting evidence in a criminal trial, we recognize, has the necessary effect of legitimizing the conduct which produced the evidence, while an application of the exclusionary rule withholds the constitutional imprimatur."

Yet, if *Walder* is followed, the "necessary effect of legitimizing the conduct" noted in *Terry* will be given to government action which produces illegally obtained evidence.

It would be technically possible to distinguish *Walder* on the grounds that in the instant case the evidence was found in the course of the police investigation of the charge now being litigated, while in *Walder* the evidence was found in a previous and independent investigation.[15] There are two difficulties with the distinction. First, the Court in *Walder* considered the decisive factor to be the testimony of the defendant and the need to rebut it, not the time when the evidence was obtained. Second, the distinction is artificial and overlooks the basis of the exclusionary rule: that illegally obtained evidence "shall not be used at all."

We conclude that the practical and theoretical basis of the *Walder* decision is no longer viable. We hold, therefore, that *Walder* is not binding authority and that illegally seized evidence may not be used in cross-examining the defendant or for rebutting his testimony.

Finally, the question arises as to whether the error was prejudicial. It was defendant's position at trial that the shooting was accidental and that he thought the gun was not loaded. His assertion that he was living with his wife and that they were getting along took on significance in relation to his defense of accident. It was in response to this de-

---

[15] This distinction was noted, by way of footnote, in *Groshart* v. *United States* (fn 13), at p 178:

"As we have noted previously, however, *Walder* involved an unusual situation where two distinct prosecutions had occurred and where evidence illegally seized in connection with the first prosecution was used for impeachment purposes during the second prosecution. Because of this unusual situation, some of the considerations that we discuss *infra* are not applicable to the same extent in terms of the *Walder* factual situation."

fense and in an attempt to attack defendant's credibility that the prosecution offered the illegally obtained evidence.

In light of the emphasis given the evidence during the prosecutor's summation to the jury, and its relation to defendant's basic position and the issue of his credibility,[16] we are not satisfied beyond a reasonable doubt that the evidence did not contribute to defendant's conviction. *Chapman* v. *California* (1967), 386 US 18 (87 S Ct 824; 17 L Ed 2d 705); *People* v. *Teal* (1969), 20 Mich App 176; *People* v. *Young* (1969), 20 Mich App 211.

The trial court ruled below that defendant lacked standing to raise the issue of the legality of the search. The prosecution was, thus, never afforded an opportunity to justify the search. Absent such an opportunity we deem it inappropriate to assume the search was illegal and that a new trial must be granted. Therefore, we remand for an evidentiary hearing to determine the legality of the search.

While our research has not revealed Michigan authority on the question of which party has the burden of proof[17] (*cf.*, however, *People* v. *Hagadorn*

---

[16] Regarding the importance of credibility, it is interesting to note in Kalven and Zeisel, *The American Jury* (Little, Brown and Company, 1966), that while one of the conclusions of the study of juries was that juries tend to acquit more often than a judge sitting without a jury, the opposite was true if the defendant made a statement of fact which the judge and jury believed to be false. The authors noted at p 387:

"[T]he defendant, in an apparent effort to make a good case better, tells a story which neither the judge nor the jury believes. The jury, having found him not credible in one part of his testimony, rejects the rest of it and convicts; the judge, sensing the foolish motivation of the defendant, is able to separate the false part of the defendant's story from the true. The jury in these cases is following the old credibility maxim, *falsus in uno, falsus in omnibus*, whereas the judge, if we are to match maxims, separates the wheat from the chaff."

[17] We are not unfamiliar with the headnote in *People* v. *Ferguson* (1965), 376 Mich 90, which reads:

"The burden of asserting and proving facts constituting an illegal search and seizure is upon the defendant moving to suppress the

[1931], 255 Mich 121), numerous cases from other jurisdictions have held that the prosecution must prove that its warrantless search was reasonable.[18] These cases are consistent with the language of the Court[19] in *United States* v. *Jeffers, supra:*

"Over and again this Court has emphasized that the mandate of the Amendment requires adherence to judicial processes. See *Weeks* v. *United States*

evidence, and where such burden is not sustained, the motion should be denied."

Our reading of *Ferguson*, however, convinces us that the headnote is totally unsupported by the decision itself. The language in the decision to which the headnote refers simply holds that where defendant has not moved to suppress prior to trial the burden of asserting and proving lack of knowledge of the search is on the defendant, if he is to justify his failure to move prior to trial. As the Court noted in *Ferguson* at p 95, within the facts of the case "the suggestion is very strong that he knew how the police secured the weapon."

The Court in *Ferguson* cited *People* v. *Robinson* (1955), 344 Mich 353, which supports the actual holding of the case, but gives no support whatsoever for the headnote. In *Robinson* a deputy had made an arrest for a misdemeanor committed in his presence. The defendant challenged the officer's authority to make the arrest, arguing that since there was a lack of authority any evidence obtained by the illegal conduct must be suppressed. The Court stated at p 364 that defendant had the burden of proving lack of authority of the arresting officer. Yet, even that statement was *dicta* since the holding of the case was that defendant could not raise the issue since he made no motion to suppress prior to trial.

Neither *Ferguson* nor *Robinson* support the conclusion that the defendant must prove the unconstitutionality of a warrantless search.

18 See *Brett* v. *United States* (CA 5, 1969), 412 F2d 401; *Anderson* v. *Rundle* (ED Pa, 1967), 274 F Supp 364; *Parrish* v. *The Civil Service Commission of The County of Alameda* (1967), 66 Cal 2d 260 (57 Cal Rptr 623, 425 P2d 223); *State* v. *Call* (1965), 8 Ohio App 2d 277 (37 Ohio Op 2d 274, 220 NE2d 130); *Commonwealth* v. *Ellsworth* (1966), 421 Pa 169 (218 A2d 249); *Ellison* v. *State* (Alaska, 1963), 383 P2d 716; *State* v. *Gaudiosi* (1967), 97 NJ Super 565 (235 A2d 680); *People* v. *Cardaio* (1966), 18 NY2d 924 (276 NYS2d 1004, 223 NE2d 497).

19 Placing the burden on the prosecution to show the reasonableness of a warrantless search is also consistent with the settled rule in Michigan that the prosecution has the burden of showing consent to a search by clear and convincing evidence. *People* v. *Kaigler* (1962), 368 Mich 281; *People* v. *Smith* (1969), 19 Mich App 359; *People* v. *Bunker* (1970), 22 Mich App 396. See, also, *Bumper* v. *North Carolina* (1968), 391 US 543 (88 S Ct 1788; 20 L Ed 2d 797).

(1914), 232 US 383 (34 S Ct 341; 58 L Ed 652);
*Agnello* v. *United States* (1925), 269 US 20 (46 S Ct
4; 70 L Ed 145). Only where incident to a valid
arrest, *United States* v. *Rabinowitz* (1950), 339 US
56 (70 S Ct 430; 94 L Ed 653), or in 'exceptional
circumstances,' *Johnson* v. *United States* (1948), 333
US 10 (68 S Ct 367; 92 L Ed 436), may an exemption
lie, *and then the burden is on those seeking the ex-
emption to show the need for it, McDonald* v. *United
States* (1948), 335 US 451, 456 (69 S Ct 191, 193;
95 L Ed 153, 158)." (Emphasis supplied.)

And in *McDonald* v. *United States* (1948), 335 US
451 (69 S Ct 191; 93 L Ed 153), the Court noted at
p 454 (69 S Ct at p 193; 93 L Ed at p 158) : "Where,
as here, officers are not responding to an emergency,
there must be compelling reasons to justify the ab-
sence of a search warrant. A search without a
warrant demands exceptional circumstances." The
Court concluded at p 456 (69 S Ct at p 193; 93 L Ed
at p 158) :

"We cannot be true to that constitutional require-
ment and excuse the absence of a search warrant
without a showing by those who seek exemption
from the constitutional mandate that the exigencies
of the situation made that course imperative."

In regard to the prosecutor's burden of proof, we
note that on appeal he has argued the the search
was legal because of the existence of probable cause
to believe defendant did the shooting. While such
probable cause undoubtedly existed and would have
clearly served as the basis of an arrest, it did not
legalize the search of defendant's room. Permis-
sible, warrantless searches are the exception and
only allowed incident to an arrest or where the
exigencies of the situation make the warrant re-

quirement itself unreasonable. *Chimel* v. *California* (1969), 395 US 752 (89 S Ct 2034; 23 L Ed 2d 685).[20] If probable cause justifying an arrest also justified a warrantless search of a defendant's dwelling, then as a practical matter search warrants would be rarely required.[21]

Defendant also challenges the instructions to the jury on two grounds. Although given the express opportunity by the trial court neither objection to the instruction was raised below by defendant. Defendant's failure of timely objection waives any possible right he might have had to object now to the instructions. *People* v. *Mallory* (1966), 2 Mich

---

[20] We recognize that our recent opinion in *People* v. *Herrera* (1969), 19 Mich App 216, held *Chimel* v. *California* (1969), 395 US 752 (89 S Ct 2034; 23 L Ed 2d 685), not to be retroactive in application. *Herrera*, however, was concerned only with *Chimel's* holding limiting a search incident to an arrest to the area necessary for the protection of the arresting officer and prevention of the concealment or destruction of evidence and its overruling of *United States* v. *Rabinowitz* (1950), 339 US 56 (70 S Ct 430; 94 L Ed 653). Where, as here, *Chimel* merely reiterated existing law, it will, of course, not be limited to prospective application.

[21] *Cf. Chimel* v. *California* (1969), 395 US 752 (89 S Ct 2034; 23 L Ed 2d 685):

"Even in the *Agnello* case the Court relied upon the rule that '[b]elief, however well founded, that an article sought is concealed in a dwelling house, furnishes no justification for a search of that place without a warrant. And such searches are held unlawful notwithstanding facts unquestionably showing probable cause.' 269 US at 33 (46 S Ct at 6; 70 L Ed at 149). Clearly, the general requirement that a search warrant be obtained is not lightly to be dispensed with, and 'the burden is on those seeking [an] exemption [from the requirement] to show the need for it * * * .' *United States* v. *Jeffers* (1951), 342 US 48, 51 (72 S Ct 93, 95; 96 L Ed 59, 64).

"Only last term in *Terry* v. *Ohio* (1968), 392 US 1 (88 S Ct 1868; 20 L Ed 2d 889), we emphasized that 'the police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure.' *Id.,* at 20 (88 S Ct at 1879; 20 L Ed 2d at 905), and that '[t]he scope of [a] search must be "strictly tied to and justified by" the circumstances which rendered its initiation permissible.' *Id.,* at 19 (88 S Ct 1878; 20 L Ed 2d at 904)." (Emphasis supplied.)

As is thus made clear in *Chimel*, probable cause to believe evidence is present does not justify a *warrantless* search. It does, however, serve as a basis for the issuance of a search warrant. MCLA § 780.652 (Stat Ann 1970 Cum Supp § 28.1259[2][d]).

App 359; *People* v. *Allar* (1969), 19 Mich App 675; GCR 1963, 516.2.

We remand to give the prosecution an opportunity to show by clear and convincing evidence "the compelling reasons to justify the absence of a search warrant" and the "exigencies of the situation [that] made that course imperative."

If, following the hearing, the trial court concludes that the search and seizure were reasonable, the conviction shall stand affirmed. If it is concluded, however, that the search was unreasonable, a new trial shall be ordered.

Remanded for actions consistent with this opinion. We do not retain jurisdiction.

All concurred.